No. 13440

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

GLORIA RAY EAGAN,

Defendant and Appellant.

Appeal from: District Court of the Sixteenth Judicial District,
Honorable Alfred B. Coate, Judge presiding.

Counsel of Record:

For Appellant:

Patrick J. Kelly argued, Miles City, Montana
David J. Patterson, Missoula, Montana

For Respondent:

Hom. Mike Greely, Attorney General, Helena, Montana
Allen B. Chronister argued, Assistant Attorney General,
Helena, Montana
Denzil Young argued, County Attorney, Baker, Montana

Submitted: June 5, 1978

Decided: AUG 2 1978

Filed: AUG 2 1978

Thomas J. Kearney
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal by defendant Gloria Ray Eagan from her conviction of the offense of mitigated deliberate homicide, entered in the District Court of the Sixteenth Judicial District, Fallon County, Montana.

The single issue to be decided on this appeal is whether there was impropriety in the handling of a problem that arose during defendant's trial when one of the empaneled jurors made statements in a public place, outside the place of trial, indicating his prejudice, and implying that others on the jury panel might also be prejudiced against defendant.

Accordingly, the facts can be briefly stated as far as the alleged crime is concerned. Defendant was charged by information with the offense of deliberate homicide arising out of the shooting death of one Russell Hanson on July 13, 1975. Defendant claimed that Russell Hanson, while a guest at her home in the early morning hours of that date, had attacked her and attempted to rape her, and that she was required to repel his aggression by threatening to use a 30.30 rifle against him. Defendant stated she had ordered the decedent to get out of her mobile home and that the decedent, instead of leaving, had taken a sitting position on a couch in the home. At a time when he was apparently starting to get up from the couch, defendant claimed the rifle accidentally discharged while she was holding it at waist level, and the bullet therefrom struck Hanson and caused his death.

The case was tried beginning February 2, 1976, in District Court. The jury was empaneled on the first day and opening statements were made. Trial continued through

February 3, 1976, with the calling of witnesses.  On February 4, 1976, when the defense was presenting its case and defendant herself had been examined and cross-examined, counsel for defendant informed the court that he had just learned that one of the jurors, Roland Kruger, had made statements in a bar in the downtown area the evening before.  The person to whom he made the statements was eventually called before the court to report what was said.  Here is what the record shows with respect to the out-of-court statements:

"THE COURT:  Let the record show that the Court is in chambers with Counsel and the Clerk and that it is 1:00 o'clock.  Immediately prior to the noon break, Counsel appeared in chambers and advised the Court that one of the jurors on the panel sitting in the Cause now being tried had been downtown last evening in the bar discussing this case in public and the Court then ordered that this meeting be held at 1:00 and that the person who overheard the juror be brought before the Court In Camera and his testimony be taken.

"JOHN MEYERS, having been first duly sworn by the Clerk, testified upon his oath as follows:

"BY THE COURT:

"Q.  For the record, will you state your name.

"A.  John Meyers.

"Q.  Where do you live?

"A.  Phebus Trailer Court.

"Q.  It is my understanding that you were downtown last evening, is that correct?

"A.  Yes.

"Q.  Where were you at?

"A.  Corner Bar.

"Q.  At what time was this?

"A.  About 9:30.

"Q.  What happened in the Corner Bar at about 9:30?

"A.   Well, Roland Kruger was telling me that, you know, that he was on jury duty and as far as he was concerned, that she was guilty and he also told me that half of the jury is Hanson's friends.

"Q.   Who else was present when he was talking to you?

"A.   He was just by me at the end of the Bar.

"Q.   There wasn't anyone else that overheard that conversation?

"A.   No.

"THE COURT:   Do Counsel have any other questions?

"BY MR. YOUNG:

"Q.   Have you seen him other nights down there? Has he been down Monday night?

"A.   Well, let me see.   I didn't go uptown Monday night.

"MR. KELLY:   I have no questions.

"Q.   (By Mr. Young)   Was he drunk?

"A.   Yes.

"Q.   Which is frequent to him?

"A.   Yes.

"THE COURT:   Do you have any other questions, Denzil?

"MR. YOUNG:   No, I don't think so.

"MR. KELLY:   I have one.

"Q.   He communicated directly with you?

"A.   Yes.

"MR. KELLY:   That is all I have.   Thank you.

"THE COURT:   Okay.   That is all,   Thank you.

"(Witness excused.)

"THE COURT:   Now, I think that we should call him in and ask him, give him an opportunity to explain it or deny it or admit it.

"MR. YOUNG:   I suggested to Pat that if, you know, if this were supported, rather than create a furor on the jury, we could wait until the case is in and excuse him and use the first alternate.   If he were called in here and examined, he would be excused and there--I was thinking, it might cause a little distraction for the jury if he disappeared suddenly.

-4-

"THE COURT: Well, this is fine. I think that we ought to have him in and have him testify.

"MR. KELLY: I agree.

"THE COURT: Whether we do it now or do it following recess at the conclusion of today's trial is immaterial to me.

"MR. YOUNG: It doesn't matter to me.

"THE COURT: Then in the event that he says, 'Yeah, I did it,' what are Counsel's suggestions?

"MR. KELLY: My suggestion--well, first of all, as to him, I think that he should be excused at the conclusion of the case prior to the jury going to the deliberations. I think the proper alternate should be put in his stead. I have a second question. Does this indicate a problem other than with him on this jury? And I am wondering if we have any information from the Bailiff regarding conversations. Have they been discussing this case prior to the time of being charged? I just don't know. That is a question. I don't have any answer. With him, I have no doubts he should be excused.

"MR. YOUNG: I will ask him if he has discussed it with any of the other jurors.

"THE COURT: Well, I think this is a proper inquiry to ask him. If he has been discussing the case with the other jurors, that is--and whether the rest of the jury have indicated that they have made their minds up and if the other members of the jury have, then I suppose we have a mistrial. And if we have a mistrial, I suppose that we better find out about it today.

"MR. YOUNG: We don't have any reason to think that the rest of the jury is contaminated.

"THE COURT: No, but if he says this is what has happened and the whole jury is contaminated, then I think we may as well declare a mistrial and start over again. If, on the other hand, he says, no, he hasn't talked with the rest of the jury, or he hasn't heard any of them talk, then I think what we ought to do is get rid of him and put an alternate in and go ahead and complete the trial. I am not going to presume that all of these people break their oath.

"ROLAND KRUGER, being first duly sworn by the Clerk, testified upon his oath as follows:

"BY THE COURT:

"Q. Roland, it has been brought to the attention of the Court that last night you were downtown in the Corner Bar at about 9:30 and while you were

-5-

there, you advised a person that you had made up your mind that the defendant was guilty. You further advised this individual that about half of the jury were personal friends of the Hanson family. Is this charge true?

"A. Pardon?

"Q. Is this charge true?

"A. Not to my knowledge, nope.

"Q. Were you downtown last night?

"A. Yes.

"Q. Were you in the Corner Bar?

"A. Yes, I was.

"Q. Were you there about 9:30?

"A. I would assume so.

"Q. And while you were there, you were down at the end of the bar talking to John Meyers?

"A. John Meyers? I don't even know the guy personally. What does he do?

"Q. He is a very dark complected person. Black hair.

"A. Oh, did he used to work for Signal? Yes, I was uptown, but any statement I made, I made a joke of it. There was no --

"Q. Well, have you discussed this case with any of the other jurors?

"A. No, I haven't.

"Q. Have any of the jurors discussed it with you?

"A. No, they sure haven't. No, I am positive. I am not that type of guy.

"THE COURT: Do Counsel have any questions?

"MR. YOUNG: No.

"MR. KELLY: No.

"A. No, if I said anything, it was in the line of bull. There was no business talk.

"THE COURT: Okay, you may leave. Tell the Bailiff that I will advise him when we are ready to proceed.

"(Witness excused.)

"THE COURT: Okay, what is the suggestion?

"MR. KELLY: His answer was that anything he said was made in a -- said in a humorous fashion. So I take it as some of the admission in connection with his conversation of this case. I would think, at the very least, he should be excused.

"THE COURT: I think so.

"MR. KELLY: I would also suggest that he might -- He appears to be either extremely hung over or perhaps he is under the influence right now.

"THE CLERK: Hard of hearing, I think.

"MR. YOUNG: He worked for many years, rig work, has probably affected his hearing. I haven't talked to him for a couple of years and I am not aware of that problem.

"THE COURT: All right. Now, did you want me to excuse him now or at the conclusion of today's case?

"MR. KELLY: I don't think he should be excused now. I think at the conclusion of today's case.

"MR. YOUNG: Fine.

"THE COURT: All right. Let's go."

Thereafter, the District Court resumed the trial, with Mr. Kruger still sitting in the jury for the balance of the afternoon, during which time the remaining testimony in the case was completed. That evening the instructions were settled, whereupon counsel for defendant moved the court for a mistrial of the cause upon the ground that there had been improper conduct on the part of the jury as evidenced by the hearing earlier had that day. The motion was denied by the District Court.

On the following morning, February 5, 1976, trial was resumed at 9:30 a.m. at which time the following proceedings took place in chambers:

"IN CHAMBERS:

"(Mr. Kruger called in.)

"THE COURT: After thinking about this matter we discussed yesterday, the consequences are that if it were provable, if you made these statements, we would have a mistrial and we would have to go through the whole thing one more time at a considerable expense to the county.

"A. Yes.

"THE COURT: Not only that, but if it were provable, you would have violated at least two laws, those being contempt of court and failure to perform your official duties. And I am not interested in seeing you charged with a crime. I am not interested in anything other than seeing that this trial is properly, fairly conducted and that the county isn't put to the expense of retrying it. And so, for that reason, I think it would be best of all if I remove you as a juror and put one of the alternates in your spot. And that is what I am going to do.

"A. Yes.

"THE COURT: And I think that, first of all, as far as you are concerned, I am going to instruct you not to discuss this trial or not to discuss the reason that you were removed with anybody, and if you do, I will charge you with contempt of court because I don't want a built-in error in this case. It is too important of a case.

"A. Yes, I realize that.

"THE COURT: So it might be better for you and for everybody if you just say you got sick today and you couldn't sit.

"A. Well, I have a question if I may ask it. Who called this in?

"THE COURT: Well, the report came to the Court through defense counsel. Somebody advised him. I don't know, I didn't ask.

"A. Who would it come to?

"THE COURT: Well, defense counsel is the person that told me. Now, I don't know where he heard it.

"A. Yes, because if I remember right, it was-- Was it Meyers?

"THE COURT: Yes. It is an unfortunate thing and what you can do is stay here and I will call the jury in and then --

"(Whereupon Mr. Kruger was replaced by Alternate Juror No. 1.)"

-8-

Thereafter, with Kruger excused, and the alternate juror sitting in his place, the jury retired to consider its verdict, and returned its finding that defendant was guilty of mitigated deliberate homicide. On February 26, 1976, defendant was sentenced to a term of five years in the state prison. She moved for a new trial on the ground she had been denied her constitutional right to a fair and impartial jury. The motion for new trial was denied on March 11, 1976, and thereafter this appeal ensued.

Defendant states two issues for review on appeal:

1. Was the statement made by Juror Kruger such that it constituted sufficient misconduct and prejudice on the part of the jury so as to require a mistrial?

2. Did the alternative remedy chosen by the court, that is, replacing the jury with an alternate, cure the trial defect?

We will consider the issues together.

The right of a defendant to speedy public trial by an impartial jury is so sacred to our system of jurisprudence that it is preserved both in our state and federal constitutions. Article II, Section 24, 1972 Montana Constitution; Sixth Amendment, United States Constitution.

The verbatim excerpt from the transcript indicates the District Court, as well as counsel, were fully aware of the sanctity of defendant's right to an impartial jury. We are called upon here to determine whether the course of action taken by the District Court upon the discovery of a disqualified juror did in fact remove any prejudicial effect occasioned thereby so that defendant was accorded her right of fair trial.

For the most part, it seems that we would regard as persuasive the finding or determination of the District Court that any prejudicial effect of misconduct by a juror had in fact been removed. Certainly in such matters as whether, for example, the responses of a prospective juror on voir dire indicate his state of mind, or whether a juror had in fact disqualified himself by prejudicial statements, the determination by the District Court would be given considerable weight by this Court. In the situation presented here, however, it appears that this Court is in as good a position as the trial court to make this judgment where there are no factual conflicts apparent regarding the conduct itself. As was stated in People v. Brown, (1976), 132 Cal.Rptr. 217, 220, 221:

> "Some cases have treated the issue of the
> prejudicial effect of jury misconduct as being
> a question of fact for the trial court and
> have held that a finding of no prejudice im-
> plied in the denial of a new trial should not
> be set aside unless there is no evidence to
> sustain it. * * * We are of the view however
> that the more enlightened and appropriate rule
> is that since jury misconduct challenges the
> fundamental right to an unprejudiced jury and
> the fairness of the trial proceedings, this
> issue is an independent appellate issue to be
> adjudicated by this court based upon the whole
> record. * * *"

From the record it appears that the challenged juror did in fact make the statements attributed to him in a public place to a third person, while the trial was in progress. When the juror was brought before the court in chambers, he first denied that he knew the third person. Then the juror indicated that he was merely joking as to any statements he had made. Following that he stated he had not discussed the case with any of the other jurors.

When the juror was excused after his examination, there was a discussion by court and counsel as to whether he was "under the influence" or hung over, or whether he was in fact hard of hearing. At any rate, the juror was permitted to sit with the remainder of the jury for the balance of the time that testimony was taken that day.

Further, the record reflects that in the period when the challenged juror was sitting with the jury, following his examination in chambers, four recesses were taken by the court during the remainder of the afternoon. There was a recess taken while court and counsel retired to chambers to discuss a legal point, and a further recess for the same purpose. A rest-period recess was taken midafternoon, and at the conclusion of the testimony, an evening recess was declared until 9:30 a.m. the following morning. On each of these occasions it appears the District Court instructed the jury with the usual admonition that they should not discuss this case with each other or among themselves or with others; but, it is also to be noted that the same admonition had been given prior to the discovery of the prejudicial statements, which admonition the challenged juror apparently ignored. Allowing this juror to sit with the remainder of the jury, including the alternate, after the discovery that he was a disqualified juror is the first difficulty we find in the procedure followed by the District Court.

The second difficulty relates to the balance of the statements attributed to the same juror--that is, "he also told me that half of the jury is Hanson's friends". The questions by the District Court on this point to Kruger did not quite reach the source of this juror's information as to this statement, nor the implication therein that half of the jury was also prejudiced against defendant.

-11-

The third difficulty relates to whether the disqualified juror may have made known his prejudice to the other members of the jury. The District Court relied completely upon the responses of the challenged juror that he had not discussed the case with the other jurors. At no stage of the trial were the other jurors interrogated by the District Court as to what contact or expression of opinion the challenged juror may have made to them while he was sitting with them on the jury panel. This is important because as pointed out in People v. Brown, supra:

> "In approaching the issue of prejudice, it first must be noted that a unanimous verdict is required in a criminal case. Thus, the disqualification of a single juror could have resulted in a different verdict on any of the counts." 132 Cal.Rptr. at 221.

The duty to preserve a fair trial for the defendant rests in the first instance upon the trial judge. People v. Shaw, (Mich. 1969), 164 N.W.2d 7, 12, 13. When a juror is found to have been guilty of improper conduct, such improper conduct is charged to the entire panel, Kinkaid v. Wade, (Kan. 1966), 410 P.2d 333, 337, since the jurors operate as a unit, and since public policy demands that misconduct be discouraged and insofar as possible prohibited. Kinkaid, at 337. We cannot assume therefore that the remainder of the jury panel had been safeguarded from contamination in the absence of some interrogation addressed to those jurors to dispel the possibility that prejudice existed, either from friendship, or from prejudicial comments by Kruger.

It is this factor that distinguishes this case from State v. Baugh, (1977), _____ Mont. _____, 571 P.2d 779, 34 St.Rep. 1315. Baugh was a case where the District Court learned during the course of the trial that one of the jurors had, before the trial, viewed a videotape of the

-12-

exhumation of the deceased. The court learned of this fact
five days after the trial had commenced. The court called
the juror into chambers and determined there that the juror
had in fact previewed the videotape. The juror, upon the
court's question, indicated that no other juror knew that
she had viewed the videotape. The court immediately excused
the juror from further service and allowed the trial to
proceed by seating one of the alternate jurors. However,
the District Court in Baugh took one more important step.
After the jury had reached its verdict, but before the
verdict was announced, the court questioned the jury and
asked them if at any time during the trial the disqualified
juror had discussed with any of them any of the evidence on
the trial. All of the jury responded "No". In this case we
have no such reassuring interrogation. There is left hanging
in the air here the implication that one half of the jury in
this case were friends of the decedent over whose death
defendant was being tried; moreover, the possibility that
the disqualified juror may have communicated his prejudice
to other members of the jury was not fully searched out. In
that situation it cannot be stated unequivocally that no
prejudice against defendant had occurred.

It is the rule in this state that if jury misconduct is
shown tending to injure the defendant, prejudice to the
defendant is presumed; however, the presumption is not
absolute and may be rebutted by the use of testimony of the
jurors to show facts which prove that prejudice or injury
did not or could not occur. State v. Jackson, (1890), 9
Mont. 508, 522, 24 P. 213, 216. Putro v. Baker and Mannix
Electric, Inc., (1966), 147 Mont. 139, 147, 410 P.2d 717,
722.

The procedure followed by the District Court in <u>Baugh</u> had the effect of overcoming the presumption of prejudice caused by jury misconduct. The response of the jurors, before their verdict was announced, overcame the presumption. In this case, the members of the jury were not so interrogated, and therefore the presumption of prejudice remains.

What this Court said in <u>Putro</u>, supra, bears repeating:

"The guiding principle of our legal system is fairness. We must tenaciously adhere to the ideal that both sides of a lawsuit be guaranteed a fair trial. Sec. 27, Art. III, Montana Constitution. The function of the jury is to decide the facts of the case only on evidence introduced at trial. It has been noted that 'There is no practicable method to so analyze the mental operation of the jurors as to determine whether, in point of fact, the verdict would have been the same if the trial had been conducted, as both parties had a right to expect, according to law and upon the evidence in court.' McDaniels v. McDaniels, 40 Vt. 363. The trial court should have declared a mistrial in justice to itself as well as to parties, so that a fair trial may result and the verdict when rendered may be entitled to the respect of both parties and the confidence of the court. We cannot be too strict in guarding trials by juries from improper influences. This strictness is necessary to give due confidence to parties in the results of their causes, and to enlighten the public who have recourse to our courts that any improper influence which has the natural tendency to prejudice the verdict is grounds for a mistrial. * * *" 147 Mont. 147, 148, 410 P.2d 722.

We reverse the judgment of conviction against defendant and remand for a new trial.

_____
/ John C. Sheehy
/ Justice

We Concur:

_____

_____
Justices

Mr. Justice John Conway Harrison dissenting:

I dissent.  By sheer speculation the majority finds, without a scintilla of proof, that the jury might have been influenced by something Juror Kruger said or did before being removed at the conclusion of the case.

Our recent case of State v. Baugh, (1977), ____ Mont. ____, 571 P.2d 779, 34 St.Rep. 1315, is in my view controlling.  In that case we held:

> "Defendant was not prejudiced by the
> occurrence involving juror Kolar.
> While serious prejudice may have arisen
> if juror Kolar had participated in the
> verdict, those problems were thus arrested
> by replacing her with an alternate juror
> and the further safeguards taken by the
> trial judge."  571 P.2d 784.

The same can be said here.  The trial court questioned the offending juror to insure he had not discussed the case with the other jurors.  The defense counsel agreed that the court should wait until the conclusion of the evidence to dismiss the juror so as not to disrupt the jury.  The court went further by instructing the juror not to discuss his removal with anyone and to say he was sick, if asked.

In addition, there is nothing in the record to show prejudice to the appellant.  The fact the juror said the victim's family "enjoyed the friendship of most people in the area" falls far short of the prejudice that would prevent a fair trial.  This fact came out during voir dire examination.  The juror himself contradicted any factual basis for the statement when he denied talking to any of the jurors or that any had talked to him.

-16-

Here, the trial court had the opportunity to take what curative measures were necessary before the jury's deliberations began and I can find no basis for finding any prejudice against the appellant warranting a new trial.

_____
                    Justice

Mr. Chief Justice Frank I. Haswell concurs with the dissent.

_____
                  Chief Justice