No. 93-066

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

WILLIAM JAY GOLLEHON,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Byron Boggs, Attorney at Law, Missoula,
Montana: William F. Hooks, Appellate
Defender, Helena, Montana

    For Respondent:

        Hon. Joseph P. Mazurek, Attorney General,
John P. Connor, Jr., Assistant Attorney
General, Helena, Montana

FILED

DEC 07 1993

Filed: *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs:  September 23, 1993

Decided:  December 7, 1993

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

Defendant William Jay Gollehon was charged in the District Court for the Third Judicial District in Powell County with two counts of kidnapping by accountability, one count of burglary, and five counts of deliberate homicide. Following a seven-day jury trial in Bozeman, Montana, Gollehon was convicted of all charges and was subsequently sentenced by the District Court. Gollehon appeals from his convictions. We affirm the judgment of the District Court.

The following issues are presented on appeal:

1. Did the District Court err when it denied defendant's motion to dismiss the charge of burglary?

2. Did the District Court err when it denied defendant's motion to dismiss the five counts of deliberate homicide?

3. Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the victims?

4. Did the District Court err when it denied defendant's motion for mistrial on the basis of juror misconduct?

5. Did the State's destruction of certain physical evidence deny defendant his constitutional right to due process of law?

On the morning of September 22, 1991, William Jay Gollehon and eight other Montana State Prison inmates gained access to, and took control of, the maximum security unit of the prison. When officers regained control of the building four hours later, five protective

2

custody inmates had died as a result of the riot that Gollehon and others participated in.

The maximum security building is divided into two separate areas. "A Block," "B Block," and "C Block" are located on the west side of the building. "D Block," "E Block," and "F Block" are located on the east side. Control cages are located on each side of the building. The west control cage regulates the power to A, B, and C Blocks, and the east control cage regulates the power to D, E, and F Blocks. Centered between the two units of the building are six separate exercise yards. At the time of the riot, there were ten protective custody inmates housed on D Block, and a total of 68 inmates in the maximum security building. Gollehon was one of the maximum security inmates housed on C Block.

During the morning of September 22, 1991, thirteen inmates, including Gollehon, were in the exercise yards. While officers were returning some of the inmates from the exercise yards to their cells, Gollehon and eight other inmates broke through the wire fences separating the exercise areas and eventually gained access to the section of the maximum security building leading to A, B, and C Blocks. Once inside the building, the inmates were able to reach both control cages and ultimately were able to open the doors to all of the blocks in the maximum security unit.

While the inmates had control of the building, five officers took refuge by locking themselves in a shower facility in C Block. The inmates threatened to burn the officers out of the shower if

3

they did not release keys to other sections of the building. The officers complied, and then heard the inmates say they were going to go to D Block and **"get"** the protective custody inmates. The officers remained in the shower until they were released by other officers after the riot.

Two protective custody inmates who were working outside their cells took refuge by barricading themselves in the laundry room. The rioting inmates, including Gollehon, tried unsuccessfully to break down the door and to smoke them out of the laundry room by starting a fire. At one point, not expecting to survive the attack, one of the inmates wrote the names of the inmates who were trying to get at them on the side of the dryer. Gollehon's name was included. Unable to get at the inmates in the laundry room, the rioting inmates entered D Block, opened the cells, and proceeded to kill five of the protective custody inmates.

On February 3, 1992, Gollehon was charged in an eight count information with two counts of kidnapping by accountability in violation of §§ 45-2-302 and 45-5-302, MCA; one count of burglary in violation of § 45-6-204, MCA; and five counts of deliberate homicide in violation of § 45-5-102(1)(b), MCA.

Gollehon filed motions to dismiss the burglary and homicide charges on the grounds that the burglary statute was not applicable to the facts of the case and that the homicide counts, based on the felony murder theory, would, therefore, necessarily fall. This motion was denied.

4

He also filed a motion to produce various items of physical evidence, including the clothing that he was wearing at the time of the alleged offenses and the clothing of the other inmates of the maximum security unit. That motion was denied for the reason that the State had destroyed the clothing and much of the personal property of the inmates after the riot.

Gollehon was convicted of all charges following a jury trial. He was sentenced to 10 years imprisonment on each count of kidnapping, and 20 years on the count of burglary, all of which were to run consecutively. He was sentenced to five concurrent terms of life imprisonment on the deliberate homicide convictions, to run consecutively with the sentences imposed for kidnapping and burglary, and the sentences already being served for prior offenses. From this judgment, Gollehon appeals.

## I.

Did the District Court err when it denied defendant's motion to dismiss the charge of burglary?

The burglary charge was based on the allegation that Gollehon had "knowingly entered or remained unlawfully in an occupied structure, the D block area of the maximum security unit, with the purpose to commit an offense therein, namely, Riot." Section 45-2-101(40), MCA, defines occupied structure as follows:

> "Occupied structure" means any building, vehicle, or other place suitable for human occupancy or night lodging of persons or for carrying on business, whether or not a person is actually present. Each unit of a building consisting of two or more units separately secured or

<u>occupied</u> <u>is a sevarate occupied structure.</u>   [Emphasis added].

Gollehon contends that the court should have dismissed the burglary charge on the basis that the definition of occupied structure is inapplicable to his unauthorized entry into D Block. He asserts that the maximum security unit is one single building, and that no sections of the building constitute a separate occupied structure apart from the remainder of the unit.   As a matter of law, he contends that he could not be charged with burglary for entering D Block during the September 1991 riot.

When reviewing a trial court's interpretation of the law, the standard of review employed by this Court is whether the court correctly interpreted the law.   *Steer, Inc. v. Department of Revenue* (1990), 245 Mont. 470, 803 P.2d 601.   In this instance, the court concluded that the burglary statute was applicable because the definition of "occupied structure" encompassed the D Block of the maximum security unit.   After considering the express language of the statute in question,  and the circumstances  of this case, we conclude that the court correctly interpreted the statute and did not err when it denied Gollehon's motion to dismiss the burglary charge.

The language used in § 45-2-101(40), MCA, defining occupied structure is plain and unambiguous.   It clearly states that each unit of a building which consists of two or more separately secured units is a separate occupied structure.   The maximum security unit

6

is a building consisting of several "blocks" which are physically distinct and are separately secured. Moreover, each block consists of separately secured cells which are intended for human occupancy. The plain language of the statute clearly contemplates that a burglary can occur within parts of a building when one unlawfully enters or remains within a separately secured unit within that building. The unauthorized entry by Gollehon and the other rioting inmates into D Block of the maximum security unit fits squarely within the burglary statute. When statutory language is plain, unambiguous, direct, and certain, a court cannot apply any other means of interpretation. *White v. white* (1981), 195 Mont. 470, 636 P.2d 844.

Gollehon claims that this interpretation of the statute is contrary to the provisions of § 45-1-102(1)(c), MCA, which requires that the definition of an offense provides "fair warning of the nature of the conduct declared to constitute an offense." He notes that the Powell County District Court records reveal that no prisoner has ever been charged with burglary for unauthorized entry into another area of the prison, but here, without fair warning that he could be charged in this manner, he stands convicted of five counts of homicide by virtue of the State's unprecedented application of the burglary statute. He contends that the burglary statute does not state that it specifically applies to prisons and that if the Legislature intended it to apply to the State Prison it

7

could have expressly so stated. Without such a statement, he asserts the inference must be drawn that such an application of the statute was not intended.

Montana's burglary statute does not enumerate specific structures or types of buildings to which it applies. Rather, the statute refers to an "occupied structure" which, in turn, is generally defined. Because the statute is general in nature, it is inconsistent to suggest that a structure satisfying the definition of an occupied structure cannot be the site of a burglary unless it is specifically enumerated. Even though no prisoners have previously been charged with burglary for conduct occurring within the prison, the language of the statute is clear and provides fair notice to all persons of conduct which constitutes the criminal offense of burglary.

Gollehon also argues that the prison handbook, which describes internal institutional rules, does not warn inmates that an inmate's presence in an unauthorized area of the prison could result in a charge of burglary in district court. The prison's orientation handbook does not serve as an exclusive list of offenses for which an inmate can be charged in court. The prison handbook warns inmates to follow all "city, county, state, and federal laws," and the internal disciplinary procedures established by the prison do not exempt inmates from compliance with the laws of the State of Montana.

Gollehon urges this Court to reject the application of the burglary statute to this situation due to the unique circumstances which exist in a prison. Because prisoners are required to be in certain authorized areas only and are not allowed the same liberties that the general population enjoys, he contends that different concepts must be employed when an inmate ventures into unauthorized areas of the prison.

The law provides that a person is liable for burglary only when he or she unlawfully enters an occupied structure <u>with the purpose to commit an offense therein.</u> Section 45-6-204(1), MCA. The fact that an inmate may be in an unauthorized area of the prison does not, by itself, constitute a burglary. However, if he or she enters that area for the purpose of committing an offense, an inmate should be as liable as anyone else for the consequences of that act. Although this Court has not previously addressed burglary in the context of a correctional facility, our decision is consistent with the holding in *People v. Pringle* (N.Y. App. Div. 1983), 465 N.Y.S.2d 742, in which a New York court addressed a similar situation. After considering language in the burglary statute defining "building" as a structure consisting of "two or more units separately secured or occupied," that court held that a nurse's station within a prison was a "building" for purposes of the burglary statute. The factor deemed decisive was that the nurse's station was an independent unit within the prison building with its

own secure entrance.  *Ptingle*, 465 N.Y.S.2d. at 743.  Here, D Block is similarly an independent area of the maximum security unit which is separately secured.  Because Gollehon entered that area for the purpose of committing an offense, we conclude that he is appropriately chargeable with burglary.

We hold that the District Court correctly concluded that Gollehon could be charged with burglary for his unauthorized entry into D Block during the September 1991 riot.

## II.

Did the District Court err when it denied defendant's motion to dismiss the five counts of deliberate homicide?

As a result of the deaths which occurred during the riot, Gollehon was charged with five counts of deliberate homicide pursuant to § 45-5-102(1)(b), MCA, which is Montana's "felony-murder rule."  That statute provides, in relevant part, that a person commits the offense of deliberate homicide if, during the course of the commission of burglary, "he or any person legally accountable for the crime causes the death of another human being."

Gollehon contends that the court should have dismissed the homicide charges because he was improperly charged with burglary, and therefore, there was no underlying felony upon which to base the homicide charges.  Since we have held that the burglary charge was proper, we conclude that this argument is without merit.

10

The District Court did not err when it denied the motion to dismiss the deliberate homicide charges.

### III.

Did the District Court abuse its discretion when it admitted into evidence autopsy photographs of the victims?

During the trial, the State introduced 20 color photographs taken by the medical examiner during the autopsies of the five victims. Gollehon contends that the court abused its discretion when it admitted these graphic photographs into evidence because their prejudicial effect far outweighed any probative value. It is his contention that the photographs had little probative value because there was no dispute that the homicides had occurred, nor was there a dispute about the identity of the victims, the position of their bodies, or the nature or location of the injuries or causes of death.

The standard of review of evidentiary rulings is whether the district court abused its discretion. *State v. Crist* (1992), 253 Mont. 442, 833 P.2d 1052. The court has broad discretion to determine whether or not evidence is relevant and admissible, and absent a showing of an abuse of discretion, the trial court's determination will not be overturned. *Crist*, 833 P.2d at 1054.

When considering whether photographs should be admitted as evidence at trial, the court must determine whether their probative value is substantially outweighed by the danger of unfair

11

prejudice.  Rule 403, **M.R.Evid.;** *State v. Henry*(1990), 241 Mont. 524, 788 **P.2d** 316.  Here, the State contends that the photographs were offered to prove the means by which the victims were killed and to corroborate the testimony of other inmates who described what they heard or saw occurring in D Block.  Although the photographs were very graphic depictions of the assaults committed against the victims, the State notes that they were only exhibited during the State Medical Examiner's testimony and the jury was not allowed to take these photographs into deliberations.

In this instance, the court concluded that the probative value of the photographs was not outweighed by the danger of unfair prejudice.  After considering the evidence in question, we are aware that the photographs depict the brutality and viciousness of the crimes committed.  However, we do not believe that they would have aroused the jurors' passions any more than other evidence of **Gollehon's** conduct.  As we stated in *state v. Doll* (1985), 214 Mont. 390, 400, 692 **P.2d** 473, 478, **"[w]e** will not demand that a trial be sanitized to the point that important and probative evidence must be excluded." We, therefore, hold that the District Court did not abuse its discretion when it admitted the autopsy photographs into evidence.

IV.

Did the District Court err when it denied defendant's motion for mistrial on the basis of juror misconduct?

12

In the course of the trial of this matter, a brief conversation occurred among one, or possibly two, jurors and a correctional officer who was providing security at the courthouse and who had testified earlier in the trial. After the presiding judge was notified of the conversation, Gollehon moved for a mistrial due to juror misconduct. The officer was questioned in chambers and he testified that the conversation concerned the Montana State University football team. He stated that the conversation occurred when two persons were waiting outside the courtroom near his security post, and that he did not realize they were members of the jury. Based on this testimony, Gollehon's motion was denied.

On appeal, Gollehon contends that the court improperly denied this motion, and that it erred by not examining the jurors in addition to the security guard. He asserts that the discussion among the jurors and a witness constituted juror misconduct which gives rise to a presumption of prejudice to Gollehon. The burden is then on the State to rebut this presumption, and testimony of the juror(s) is the appropriate method to determine if prejudice resulted. Here, because the State did not examine the jurors, he contends there was no evidence to rebut the presumption of prejudice and the court improperly denied his motion.

The standard of review for reversing a lower court's denial of a motion for mistrial requires clear and convincing evidence that

13

the trial court's ruling was erroneous. *State v. Gambrel* (1990), 246 Mont. 84, 803 P.2d 1071; *State v. Salois* (1988), 235 Mont. 276, 766 P.2d 1306. Because the trial court is in the best position to observe the jurors and determine the potential for prejudice when allegations of jury misconduct are raised, the court has significant latitude when ruling on these matters, and its determination is given considerable weight by this Court. *State v. Eagen* (1978), 178 Mont. 67, 582 P.2d 1195.

Citing this Court's holding in *Eagen* where we stated that jury misconduct tending to injure the defendant creates a rebuttable presumption of prejudice, Gollehon contends that a presumption of prejudice remains in this case because the State failed to examine the jurors and relied only on the testimony of the security guard. However, we have recently made clear that the burden of rebutting a presumption of prejudice shifts to the State "only after there has been a threshold showing of misconduct which *injures or prejudices the defendant.*" *State v. McNatt* (1993), 257 Mont. 468, 472, 849 P.2d 1050, 1052-53. In this instance, we find no initial showing that the conversation resulted in prejudice against Gollehon. The conversation was a brief, casual interchange right outside the courtroom doors, and these circumstances do not suggest a degree of impropriety which would have warranted examining those jurors or declaring a mistrial. The District Court was in the best position

14

to evaluate the incident, and in the absence of a showing of prejudice, we will defer to the court's determination that the alleged jury misconduct did not entitle Gollehon to a mistrial. We conclude that the court's denial of the motion for mistrial was not clearly erroneous.

V.

Did the State's destruction of certain physical evidence deny defendant his constitutional right to due process of law?

When prison officials regained control of the maximum security unit on September 22, 1991, all of the inmates who had participated in the riot were required to strip and immediately leave the building. Prior to trial, Gollehon's counsel requested that certain items of physical evidence, including the clothing worn by the maximum security inmates, be produced for inspection. The State responded to this discovery request by stating that the inmates' clothing had been destroyed after the riot. The State noted that, contrary to defense counsel's understanding, clothing issued to maximum security inmates had no identifying marks which would allow it to be traced to any particular inmate.

On appeal, Gollehon asserts that he was denied a fair trial because the State failed to produce what could have been powerful exculpatory evidence for his defense. It is his contention that the absence of blood on his clothing would have established that he had not engaged in the struggles with the inmates who were killed

15

and that the State's destruction of this evidence resulted in substantial prejudice to him.

The State first argues that Gollehon failed to properly raise this issue at the trial court level because no motion to dismiss was made. Therefore, the State asserts that this issue is waived *on* appeal. After considering the circumstances of this case, however, and the fact that rulings in regard to the production of this evidence were made during the trials of the other rioting inmates, we conclude that Gollehon's motion in limine sufficiently preserved the issue for consideration by this Court.

However, after reviewing the record, we do not find that the destruction of the inmates' clothing provides a basis for reversing Gollehon's conviction. This Court has made clear that a criminal defendant has a right to obtain exculpatory evidence, but his right is personal and does not require that police officers take initiative or even assist in procuring evidence on behalf of a defendant. *State v. Sadowski* (1991), 247 Mont. 63, 79, 805 P.2d 537, 546. Although the denial of one's right to obtain exculpatory evidence is a violation of due process, a defendant must show a deliberate or intentional suppression of exculpatory evidence in order to claim a per se violation of due process. *Sadowski* , 805 P.2d at 547. Furthermore, there must be a showing that the evidence in question meets the test for constitutional materiality as adopted in *State v. Halter* (1989), 238 Mont. 408, 777 P.2d 1313:

16

> Whatever the duty the Constitution imposes on the State to preserve evidence, that duty must be limited to those that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Halter,* 777 P.2d at 1316 (quoting *California v. Trombetta* (1984), 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2534, 81 L. Ed. 2d 413, 422).

In this instance, there is no showing that the clothing was destroyed with the knowledge of its potential exculpatory value or with the intent of deliberately suppressing valuable evidence. It is clear that the objective of ordering the inmates to strip was to get the unit under control and to restrain the rioting inmates from further violence. Even if Gollehon had been able to establish the absence of blood on his clothing, this would not necessarily have vitiated his accountability for the deaths of the inmates during the riot according to the statute with which he was charged.

We conclude that the destruction of the clothing does not constitute a deliberate suppression of valuable exculpatory evidence and Gollehon was, therefore, not constitutionally deprived of his right to due process.

The judgment of the District Court is affirmed.

_____
J  tice

We concur:

_J. A. Turnage_
Chief Justice

_John Conway Harrison_

_Karla M. Gray_

_William E. Hunt Sr._

Justices