FILED

12/18/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0340

DA 23-0340

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 293

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

SHAWN THOMAS ANDERSEN,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Fifteenth Judicial District,
In and For the County of Sheridan, Cause No. DC-46-2022-1
Honorable David Cybulski, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tammy A. Hinderman, Appellate Defender Division Administrator,
Charlotte Lawson, Assistant Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Brad Fjeldheim,
Assistant Attorney General, Helena, Montana

          Logan Olson, Sheridan County Attorney, Plentywood, Montana

Submitted on Briefs:  October 8, 2025

Decided:  December 18, 2025

Filed:

_____
Clerk

Cory J. Swanson delivered the Opinion of the Court.

¶1     Shawn Andersen appeals a conviction in the Fifteenth Judicial District Court in Sheridan County. Following a jury trial, Andersen was found guilty of two counts of criminal possession of dangerous drugs and one count of criminal possession of drug paraphernalia. We reverse and remand for a new trial.

¶2     We restate the issue on appeal as follows:

*Whether the District Court abused its discretion by denying Andersen's motion for mistrial.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     On September 27, 2021, Maria Bronson was working the overnight shift at the Kum and Go convenience store in Plentywood, Montana. Multiple people had patronized the store during her shift, and she had walked up and down the candy aisle "several times." As Maria was cleaning the store in the early morning hours, she noticed something on the floor in the candy aisle. Upon a closer look, she saw it was "a little bag." She "placed a wet floor sign over it so nobody moved it or disturbed it" and called the police.

¶4     Deputy Sheriff Scott Nelson responded to Maria's call and arrived at the store around 4:30 a.m. Deputy Nelson looked at the baggie and suspected it contained methamphetamine. He placed the baggie in an evidence bag. Maria told him she thought a woman named Ashley had dropped the baggie "because [Ashley] had been in that vicinity . . . ." Deputy Nelson left the store and drove to a house where he knew one of Ashley's friends lived. At this house, a resident confirmed Ashley was friends with her

2

daughter and gave Deputy Nelson "some better directions on how to get in touch with" Ashley.

¶5     Ashley called Deputy Nelson about forty minutes after the baggie was discovered. She "mentioned she didn't drop anything at the Kum and Go. She also made reference to it not being drugs." Deputy Nelson thought her preemptive denials were unusual, because he had not stated why he was looking for Ashley. Although they set a time to speak later, one of them cancelled—Deputy Nelson could not remember who—and he never followed up.

¶6     Deputy Nelson returned to the Kum and Go to watch recorded video from the surveillance camera. He reviewed recordings from around the time he entered the store and worked backwards. He watched himself collect the baggie and "noted where that position was." On the video, he saw "a very small dark spot where the baggie was," which no longer appeared after he had put the baggie into an evidence bag. He rewound the recording to 1:00 a.m., when he noticed the dark spot was gone, and watched the video forward from there. He testified at trial that he saw Shawn Andersen in the candy aisle around 1:15 a.m., and the dark spot appeared after Andersen left the aisle. He did not watch all of the footage between Andersen's appearance in the aisle and his own arrival. Instead, he "spot checked" the video, and he recalled seeing other people in the same candy aisle after Andersen was there, including Ashley. He testified the spot on the video did not move between Andersen's departure and his own arrival at the store. Deputy Nelson testified the video showed the baggie fall out of Andersen's pocket. He testified the video shifted the focus of his investigation from Ashley to Andersen.

¶7     Later, Deputy Nelson reached Andersen by telephone.  During their first conversation, Andersen "didn't seem to have an understanding why [Deputy Nelson] was calling."  The following day, they communicated via text messages, and Andersen denied dropping anything at the Kum and Go.

¶8     Maria testified she watched the surveillance footage with Deputy Nelson.  She provided her opinion that Ashley "just walked by" the baggie, "like she didn't even know it was there."  As to the footage of Andersen, she testified, "when he was going down the [a]isle, you could see something drop.  Until we could zoom in on the video, that is when we noticed it.  Or when I noticed it."  She described what she saw as "[l]ike a little white square just, boop, right onto the floor."

¶9     Deputy Remington Timothy located Andersen on January 13, 2022.  He went to a house in Plentywood where some cars Andersen was known to drive were parked outside.  A man named Brett answered the door, and Brett notified Andersen of Deputy Timothy's presence.  Andersen went outside and Deputy Timothy arrested him.  At the Sheridan County Jail, after Andersen removed his clothing, Deputy Timothy "took some various items" out of Andersen's jeans pockets, "like change, nuts and bolts or something like that[,]" a small wallet, and a tire pressure gage, and gave them to Detention Officer Patrick Gray.  Deputy Timothy recorded his jailhouse search of Andersen's belongings with his body camera.  Because he was wearing thick "search gloves" designed to protect against syringe sticks, he did not feel anything else in Andersen's pockets and believed he had removed everything.  When Deputy Timothy began to leave, Officer Gray called him back because he noticed that "in [Andersen's] . . . left front pocket there was a small little plastic

4

baggy with white crystal-like substance inside." Deputy Timothy suspected it was methamphetamine, and he seized the baggie.

¶10 The-baggies were later field tested and were presumptively positive for the presence of methamphetamine or ecstasy. Testing at the Montana State Crime Lab confirmed the presence of methamphetamine in each baggie: approximately one tenth of a gram in the first and a quarter of a gram in the second. In addition to the testimony described above, the State presented several exhibits at trial, including the Kum and Go surveillance footage. While playing the footage, the State had Deputy Nelson utilize a laser pointer to explain what was occurring in the surveillance footage. When the video was paused at 1:15 a.m., Deputy Nelson explained the "black spot was approximately right here." Deputy Nelson continued to point out the "black spot" as the State played the remainder of the video.

¶11 In closing arguments, the State repeatedly directed the jury's attention to the surveillance footage and Deputy Nelson's testimony that the video showed Andersen dropping the baggie on the floor. The State also urged the jury to consider similarities between the Kum and Go allegations and the jail search allegations when determining whether Andersen had the requisite mental state for all three charged crimes:

> I asked you guys at the beginning; I was going to come back or I told you I was going to come back here and go what are the chances right? And that is what keeps coming up in my mind as I look at this case, you know the Defendant had his wallet in the same pocket as his meth on two different occasions. They are separate instances and do need to be judge[d] separately. But your wallet, I mean that is someplace where somebody is going to tuck something else from outside. I generally know what is in my pockets. And so, it will be your prerogative to determine if there is a reasonable explanation for that. But I think you can infer and the law allows you to infer that he had that mental state. That he had the knowledge that was in his pocket.

Andersen, by contrast, urged the jury to "[f]ocus on exactly what you heard and what you actually saw. Not what everyone is telling that they saw." Andersen noted the inconsistent descriptions of what the video showed: "[Y]ou heard testimony that somebody saw a black spot or heard somebody say they saw a white spot." Andersen asked the jury, "What did you see?"

¶12 The jury began deliberations around 5:45 p.m. Some 15 minutes after starting deliberation, the jury transmitted a note to the court stating they "would like to review the footage of the Defendant in the candy [a]isle of the Kum and Go." The District Court directed the State's legal assistant to "[c]ue [the video] up right when he is coming down the candy [a]isle." The jury was brought into the courtroom at 6:02 p.m. The District Court advised the jury, "Okay folks, if you're tired of watching it and we've gone past where you want[,] yell."

¶13 According to the court reporter's summary, "While the jurors were watching the video, [the State's legal assistant] said out loud, 'There it is' when the item dropped out of Mr. Anderson's [sic] pocket. The Jurors went back into the jury room at 6:09 p.m."

¶14 Court resumed at 6:12 p.m., and Andersen moved for a mistrial on all counts. Andersen argued:

> MS. SWEENEY: Your Honor, at the end the Defense is going to make a motion for a mistrial. In the last showing of the evidence at the jury's request, from the State counsel table there is an audible "That's it" and the jury then said that will be enough and it is our position that the jury heard that audible utterance and that influenced their decision or will influence their decision.
>
> MR. FOSLAND: Your Honor, I respectfully disagree, I don't believe it's been proven.

6

THE COURT: I thought they were the ones making the comments, but.

MR. FOSLAND: No, there was a comment from counsel table, "That's it" that is accurate. However, I don't believe that has influenced the jury in a way that requires a mistrial. So, we could ask to continue on.

THE COURT: Yep, I'm going to overrule it because, because I mean I thought it came from them, so. And the one guy was kind of telling us when he wanted to watch enough and so on.

MS. SWEENEY: Sure, and so our position would just be to preserve the record, if it were looked at . . . .

THE COURT: I understand.

MS. SWEENEY: Thank you, thank you.

Within two minutes of Andersen's mistrial motion, the jury returned with guilty verdicts on all counts.

¶15 On April 26, 2023, the District Court committed Andersen to the Department of Corrections for five years, three years suspended on count one; five years, all suspended on count two; and six months in the county jail, all suspended on count three. The District Court ordered that the sentences for Counts One and Two would run consecutively to each other, while Count Three would run concurrently with Counts One and Two.

**STANDARD OF REVIEW**

¶16 This Court reviews "a district court's denial of a motion for a mistral for abuse of discretion." *State v. Erickson*, 2021 MT 320, ¶ 17, 406 Mont. 524, 500 P.3d 1243 (quoting *State v. Krause*, 2021 MT 24, ¶ 11, 403 Mont. 105, 480 P.3d 222). "A district court abuses its discretion when it 'acts arbitrarily without the employment of conscientious judgment

7

or exceeds the bounds of reason, resulting in substantial injustice.'" *Erickson*, ¶ 17 (quoting *State v. Zimmerman*, 2018 MT 94, ¶ 13, 391 Mont. 210, 417 P.3d 289).

## DISCUSSION

¶17 *Whether the District Court abused its discretion by denying Andersen's motion for mistrial.*

¶18 Before addressing the merits of Andersen's argument, we must first determine the proper standard to apply in this case. Andersen argues we should consider the legal assistant's comment to be jury misconduct and presume prejudice against Andersen. The State argues we should reject Andersen's request for a presumption and consider the comment in line with prosecutorial misconduct cases. As Andersen notes in the brief, this Court has used the term jury misconduct as a shorthand term to refer both to misconduct by a juror, and misconduct by a third party affecting a juror. *Compare State v. DeGraw*, 235 Mont. 53, 56, 764 P.2d 1290, 1292 (1988) (jury misconduct by a juror), *with State v. Holmes*, 207 Mont. 176, 182–83, 674 P.2d 1071, 1074 (1983) (finding no prejudice in juror misconduct where a third party stated he believed defendant was guilty). In this matter, we are addressing alleged misconduct by a third party affecting a juror.

¶19 A defendant has a constitutional right to a fair trial by an impartial jury. U.S. Const. amend. VI; Mont. Const. art. II, § 24. One way the right to a fair trial might be violated is through misconduct. This case concerns the difference between prosecutorial misconduct and jury misconduct. "When considering a prosecutor's conduct, we employ a two-step process to evaluate whether a district court abused its discretion in denying a defendant's motion for a mistrial: 'First, the Court considers whether the prosecutor's conduct was

8

improper; if so, we consider whether the improper conduct prejudiced the defendant's right to a fair trial.'" *Erickson*, ¶ 19 (quoting *Krause*, ¶ 25). When considering prosecutorial misconduct, "We do not presume prejudice from the alleged prosecutorial misconduct; rather, the defendant must show [the misconduct] violated his substantial rights." *State v. Aker*, 2013 MT 253, ¶ 24, 371 Mont. 491, 310 P.3d 506 (citation omitted).

¶20 Similarly, when evaluating jury misconduct, this Court considers whether "there has been a threshold showing of misconduct which *injures* or *prejudices* the defendant." *State v. Oliver*, 2022 MT 104, ¶ 33, 408 Mont. 519, 510 P.3d 1218 (quoting *State v. McNatt*, 257 Mont. 468, 472, 849 P.2d 1050, 1052–53 (1993)) (emphasis in original). Once a defendant makes a showing of misconduct, "prejudice to the defendant is presumed; however, the presumption is not absolute and may be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." *Oliver*, ¶ 33 (quoting *State v. Eagan*, 178 Mont. 67, 79, 582 P.2d 1195, 1202 (1978)).

¶21 In *Eagan*, a juror went out to a bar after the second day of a trial and told a fellow bar patron "he was on jury duty and as far as he was concerned, [the defendant] was guilty" and "half the jury" were friends of the deceased victim. *Eagan*, 178 Mont. at 70, 582 P.2d at 1197. When questioned, the juror maintained anything he said was a joke and denied discussing the case with any of the other jurors. *Eagan*, 178 Mont. at 72–73, 582 P.2d at 1198. The court replaced the juror with the alternate and did not question the rest of the jury at any point about whether the disqualified juror had discussed the case with any of them. *Eagan*, 178 Mont. at 75, 582 P.2d at 1199. This Court reversed because the single juror's misconduct was "charged to the entire panel." *Eagan*, 178 Mont. at 78, 582 P.2d

9

at 1201. Given the nature of the allegations, this Court held prejudice to the defendant was presumed but the presumption could "be rebutted by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." *Eagan*, 178 Mont. at 79, 582 P.2d at 1202 (citing *State v. Jackson*, 9 Mont. 508, 508, 24 P. 213, 216 (1890)). The Court explained this could have been accomplished through questioning the jury after they had reached a verdict but before the verdict was announced. *Eagan*, 178 Mont. at 78–79, 582 P.2d at 1201. As no evidence was produced to prove the defendant was not prejudiced, the presumption of prejudice remained and the defendant's right to a fair trial was violated. *Eagan*, 178 Mont. at 79, 582 P.2d at 1202.

¶22 Similarly, in *DeGraw*, a juror was as at a restaurant where a cook stated to a third party the defendant "had a criminal record as long as your arm." *DeGraw*, 235 Mont. at 55, 764 P.2d at 1291. Additionally, the juror informed the rest of the jury "he had reliable information from the sheriff's department" about the defendant and asked the jury if they "want to hear it"; the jury declined to hear this information. *DeGraw*, 235 Mont. at 55, 764 P.2d at 1291. The district court denied the defendant's motion for mistrial, and this Court reversed, holding the defendant established a presumption of prejudice, which the State failed to rebut. *DeGraw*, 235 Mont. at 56, 764 P.2d at 1292.

¶23 The State relies on *State v. Criswell* to argue Andersen is not entitled to a presumption of prejudice. There, the defendants were prosecuted for animal cruelty. *State v. Criswell*, 2013 MT 177, ¶ 1, 370 Mont. 511, 305 P.3d 760. In closing arguments, the prosecutor referred to the defendants' "living situation as a 'squatters camp,'" "characterized the [defendants] as 'professional freeloaders,'" asserted they "had been 'run

10

out' of Idaho for abusing animals," and implied they "had spent money on medical marijuana in lieu of providing food for their cats." *Criswell*, ¶ 7. The defendants moved for a mistrial based on these remarks, and the court denied their motion. *Criswell*, ¶ 7. We affirmed the district court. While agreeing with the defendants that the prosecutor's comments were improper, we held the defendants failed to show the comments were prejudicial. *Criswell*, ¶¶ 49-50. We concluded "it is more plausible that the jurors saw those remarks for what they were: unprofessional and unnecessary disparagements of the defendants having no bearing on the question of guilt." *Criswell*, ¶ 50.

¶24 This case falls squarely within the confines of jury misconduct and not within the prosecutorial misconduct seen in *Criswell*. The legal assistant's comment amounted to improper testimony. While her comment did not provide any new evidence, it was a lay opinion on the video evidence. By stating "there it is" when the black spot appeared on the screen, the assistant asserted her opinion of the video evidence, linking Andersen's presence to the later-recovered drugs. The assistant was not a sworn witness who previously testified during the trial, nor was she an attorney making an argument utilizing the evidence presented. Additionally, the comment occurred after the jury started deliberation, distinguishing this case from typical prosecutorial misconduct, which occurs during the trial. This separates the present case from other cases where we required defendants to demonstrate prejudice. In this case, if Andersen makes a threshold showing of conduct tending to prejudice, we will presume prejudice.

¶25 In contrast with *Eagan* and *McGraw*, where we found the defendant made a threshold showing of misconduct, in *State v. Gollehon*, we declined to presume prejudice.

11

*State v. Gollehon*, 262 Mont. 293, 302–03, 864 P.2d 1257, 1263–64 (1993). There, a brief conversation occurred between one or two jurors and a correctional officer who was providing security at the courthouse, and who was a witness during the trial. *Gollehon*, 262 Mont. at 302, 864 P.2d at 1263. The correctional officer was questioned in chambers and testified the conversation was about the Montana State University football team, and he did not realize he was talking to members of the jury. *Gollehon*, 262 Mont. at 302, 864 P.2d at 1263. The district court declined to interview the jurors or to grant a mistrial. *Gollehon*, 262 Mont. at 302, 864 P.2d at 1263. This Court affirmed, holding there was no presumption of prejudice attached as there was no "threshold showing of misconduct which *injures* or *prejudices* the defendant." *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264 (quoting *McNatt*, 257 Mont. at 472, 849 P.2d at 1052–53) (emphasis in original). "The conversation was a brief, casual interchange right outside the courtroom doors, and these circumstances do not suggest a degree of impropriety which would have warranted examining those jurors or declaring a mistrial." *Gollehon*, 262 Mont. at 303, 864 P.2d at 1264.

¶26 Additionally, in *Oliver*, a juror told a witness he was "brave" for testifying. *Oliver*, ¶ 11. The court declined to interview the juror, instead making her the alternate and deciding to only interview the juror if she was to deliberate with the jury. *Oliver*, ¶ 14. We affirmed the district court, declining to apply a presumption of prejudice. *Oliver*, ¶ 38. We held the "fleeting comment from [the juror to the witness], who was not the victim of the crime, displayed sympathy for the witness, but 'did not indicate any hostility toward the defendant, nor did it indicate that the juror had formed an opinion in relation to the

12

defendant.'" *Oliver*, ¶ 38 (quoting *McNatt*, 257 Mont. at 472, 849 P.2d at 1053). "Oliver has thus failed to meet the threshold requirement the alleged misconduct tended to injure or prejudice him, which would have imputed that injury or prejudice to the entire jury panel and shifted the burden to the State to dispel the presumption." *Oliver*, ¶ 38.

¶27 In the instant case, contrary to the State's assertion, the legal assistant's comment was not simply a cumulative repetition of evidence already provided. The surveillance footage was poor quality and the supposed "dot" on the footage was not easily noticeable. Andersen rested a key portion of his defense on the analysis of the footage, explaining the dot was described both as a "black" dot and "white" dot and was virtually unnoticeable in the recording. Due to the poor quality of the footage, the video evidence had questionable probative value absent supporting testimony. Additionally, multiple other people crossed the candy aisle, suggesting they might have dropped the methamphetamine. The legal assistant's comment drew the jury's attention to Andersen being in the aisle when the dot appeared, implicating him and exonerating other suspects. This was a direct comment on a critical piece of evidence at a crucial moment in the trial when the jury was deliberating on this exact issue. Andersen has made a threshold showing of prejudice.

¶28 We review the denial of a motion for mistrial for abuse of discretion. "A trial court has significant latitude when ruling on matters relating to juror misconduct and we will give considerable weight to its determinations, as the trial court is in the best position to observe the jurors and determine the potential for prejudice when allegations of jury misconduct are raised." *Oliver*, ¶ 32 (citation omitted; internal quotations omitted).

13

¶29 Because there is a presumption of prejudice in this case, the court was required to either declare a mistrial or allow the State to rebut the presumption "by the use of testimony of the jurors to show facts which prove that prejudice or injury did not or could not occur." *Oliver*, ¶ 33. "The improper activity must be harmless or rendered harmless in order to provide the defendant a fair trial." *Holmes*, 207 Mont. at 183, 674 P.2d at 1074. Courts are commonly reluctant to declare mistrials and restart the whole trial process (especially when the misconduct occurs in the last two minutes of the trial), but the process is necessary to ensure a defendant is afforded his constitutional right to a fair trial. If the court wanted to prevent a mistrial, it was required to conduct an inquiry and question the jury about the comment. The Court's failure to do so here was an abuse of discretion.

¶30 The video evidence likely only affected the jury on one count relating to possession of the methamphetamine found at the gas station. The discovery of a baggie of methamphetamine in Andersen's pocket next to the wallet proved his guilt on the second count. Still, the mistrial must be on all counts. We do not parse the jury's verdict. Finding guilt on one issue may affect the verdict on other counts. Therefore, by failing to properly consider the motion, the court abused its discretion and mistrial on all counts is warranted.

¶31 "The general rule is that when a defendant consents to termination of the prosecution, such as by successfully moving for a mistrial, double jeopardy does not bar retrial on the same charge." *City of Helena v. Whittinghill*, 2009 MT 343, ¶ 14, 353 Mont. 131, 219 P.3d 1244 (citations omitted). "The narrow exception to that general rule occurs when the prosecution, through intentional misconduct, goads the defendant into moving for a mistrial." *Whittinghill*, ¶ 14. "The issue turns upon the prosecutor's intent, based

14

upon objective facts and circumstances." *Whittinghill*, ¶ 15 (citation omitted). "Even when the prosecutor's conduct prompting a motion for mistrial constitutes harassment or overreaching, it is insufficient to bar a retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Whittinghill*, ¶ 15 (citation omitted). This case does not present a situation where the exception to the general rule would apply. Nothing in the record indicates the legal assistant's comment was intended to subvert the protections afforded by the Double Jeopardy Clause or otherwise goad Andersen into moving for mistrial. Remanding for a new trial is appropriate.

**CONCLUSION**

¶32 We reverse the judgment of conviction against Andersen, and remand for a new trial.

/S/ CORY J. SWANSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ INGRID GUSTAFSON

15