FILED

03/21/2018

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0519

DA 15-0519

IN THE SUPREME COURT OF THE STATE OF MONTANA

2018 MT 56

STATE OF MONTANA,

        Plaintiff and Appellee,

    v.

WILLIAM EARL CUNNINGHAM,

        Defendant and Appellant.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 14-640
Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Chad Wright, Appellate Defender, Jennifer Hurley, Assistant Appellate
Defender, Helena, Montana

        For Appellee:

            Timothy C. Fox, Montana Attorney General, Ryan Aikin, Assistant
Attorney General, Helena, Montana

            Scott D. Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  January 24, 2018

Decided:  March 21, 2018

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1    A jury in Montana's Thirteenth Judicial District Court, Yellowstone County, found William Earl Cunningham guilty of deliberate homicide committed with a dangerous weapon. The District Court sentenced Cunningham to Montana State Prison for eighty years. Cunningham appeals. We reverse and remand for a new trial.

¶2    Cunningham raises four issues on appeal. We restate the dispositive issue as:

> *Whether the District Court made numerous erroneous rulings amounting to cumulative error and requiring reversal.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    During the evening of August 1, 2014, Cunningham joined his friend and neighbor Lena Heller at a picnic table outside of their apartment building in Laurel, Montana. Heller introduced Cunningham to her friend and former co-worker, Nathan Horn. Cunningham, Heller, and Horn sat at the picnic table drinking alcohol and socializing for several hours, joined eventually by another neighbor, Stephanie See. At some point, the military came up as a topic of conversation. The conversation devolved into an argument between Cunningham, a disabled, 63-year-old United States Army veteran, and Horn, a 40-year-old United States Marine Corps veteran, about which branch of the military was better. The argument intensified, but then ended abruptly when See invited Cunningham away from the picnic table and into her apartment.

¶4    The following morning, Horn apologized to Cunningham for arguing with him. That evening, August 2, 2014, Heller again invited Cunningham to come join her and Horn to drink and socialize at the picnic table. Cunningham initially declined the invitation, but

subsequently accepted and joined Heller and Horn. Cunningham and Horn drank heavily, passing a bottle of Southern Comfort whiskey back and forth until both were drunk. Horn was so intoxicated that at one point he fell backwards off the picnic bench he was sitting on and onto the ground. Horn and Cunningham reconvened their argument about the military, the various attributes of the Army versus the Marine Corps, and continued this interaction throughout the evening. Meanwhile, Heller interacted with her smartphone—checking her social media accounts, text messaging, and making phone calls.

¶5    After hours of drinking and arguing, Horn and Cunningham's argument intensified and the two began hitting each other on the shoulder. Heller became concerned and asked Horn and Cunningham to stop arguing, but they refused. Heller took the bottle of alcohol away and threw it into a nearby dumpster. Next, Heller, through phone calls and text messages, urged Horn's nephew to come over and help her defuse the escalating argument she described as "aggressive" and "out of control." In progressively more urgent text messages, Heller told Horn's nephew that Horn was "really drunk" and asked him repeatedly to "hurry" because she "need[ed] help."

¶6    Before Horn's nephew arrived, Cunningham used the folding knife he customarily carried in a holster around his waist to cut Horn's throat, severing his left carotid artery and jugular vein. Horn was unarmed. Heller looked up from her smartphone to see Horn lying face-up on the ground with his legs draped over the overturned bench he had been sitting on and Cunningham above Horn with his knife in his hand. Cunningham told Heller to call 9-1-1 for an ambulance, which she did. Laurel Police Officer Jeremiah Johnson responded first. When he arrived, Officer Johnson saw Horn lying on the ground bleeding

3

profusely from his neck and surrounded by a pool of blood. Cunningham stood nearby and Officer Johnson overheard him say, "You don't hit me" and "He's dead." Officer Johnson administered first aid to Horn until the ambulance arrived to transfer Horn to a medical facility; however, Horn died from blood loss during transport.

¶7 Officer Johnson arrested Cunningham and, after Cunningham waived his *Miranda* rights, conducted an initial interview. Officer Johnson paused the interview and conducted a breath analysis. Cunningham's alcohol concentration, taken less than two hours after his altercation with Horn, was 0.217. The State charged Cunningham by Information with deliberate homicide, § 45-5-102, MCA, and a weapons enhancement, § 46-18-221, MCA. Cunningham provided timely notice he would rely on the defense of justifiable use of force provided in § 45-3-102, MCA. The District Court held a jury trial March 23-27, 2015. There were multiple objections and evidentiary rulings throughout the trial. The jury convicted Cunningham of deliberate homicide committed with a dangerous weapon and the District Court sentenced him to Montana State Prison for eighty years. Cunningham appeals.

**STANDARDS OF REVIEW**

¶8 We review evidentiary rulings for an abuse of discretion. *State v. Hardman*, 2012 MT 70, ¶ 8, 364 Mont. 361, 276 P.3d 839. We also review rulings on motions to interrogate the jury for an abuse of discretion. *State v. Kirkland*, 184 Mont. 229, 242-43, 602 P.2d 586, 594 (1979) (holding the district court did not abuse its discretion by denying defendant's motion to poll the jury about its potentially prejudicial exposure to a mid-trial news release). A district court abuses its discretion if it acts arbitrarily, without employing

4

conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Hardman*, ¶ 8.

## DISCUSSION

¶9  *Whether the District Court made numerous erroneous rulings amounting to cumulative error and requiring reversal.*

¶10  Cunningham argues the District Court made several erroneous rulings, the sum of which entitle him to a new trial. First, Cunningham argues the District Court erred by excluding statements Horn made to Cunningham as hearsay. Second, Cunningham argues the District Court erred by precluding Cunningham from impeaching the State's expert witness, Dr. Thomas Bennett, with evidence that Dr. Bennett had mishandled other autopsies and testified falsely in other cases. Third, Cunningham argues the District Court erred by failing to question the jury regarding their concerns about media publicity and also by improperly addressing those concerns.

*a. Horn's statements*

¶11  At trial, Cunningham admitted he caused Horn's death, but claimed his actions were in response to Horn first "coming at" Cunningham and, accordingly, necessary to prevent his own imminent death or serious bodily harm. Cunningham introduced evidence of his poor health, including various heart conditions. In their two evenings of drinking and arguing, Cunningham learned that Horn was a sniper in the Marine Corps, where he received specialized training in hand-to-hand combat; that Horn considered himself "physically fit;" that Horn was recently released from Montana State Prison, where he was housed on the "high side" or high security section, and where he received a tattoo; and that,

5

immediately prior to Cunningham using force, Horn threatened to "kick [Cunningham's] ass" and "stomp [Cunningham's] head into the ground." In chambers, the parties discussed Cunningham introducing these statements in his testimony. The State objected, arguing that the statements constituted hearsay and were inadmissible. Cunningham responded that the statements were being offered to show their impact on Cunningham and his state of mind; to establish that Horn was "threat[ening], ang[ry] and violen[t];" and explained that the statements were "not meant to establish any particular fact." The District Court held:

> I am not going to permit the statements that Mr. Horn said he was a sniper, that he had hand-to-hand combat, that he was going to kick the Defendant's ass, stomp his head into the ground, that he had just gotten out of prison, that he had done time on the high side at Deer Lodge or that he had received a tattoo to the [hand] while he was at Deer Lodge, I believe that they are hearsay statements and that they are -- would be asserted to directly prove the truth of the matter . . . .

Ultimately, because the State first "opened the door" during its cross-examination of Cunningham, the District Court allowed Cunningham to testify during redirect about Horn threatening to "kick [his] ass and stomp [his] head into the ground."

¶12 On appeal, Cunningham argues all of these statements were admissible, non-hearsay, and probative of both his and Horn's state of mind. Cunningham wanted to convey to the jury the information he learned about Horn that led him to use the level of force that he did against Horn. Further, Cunningham argues that although he was eventually able to testify to Horn's physical threats during redirect, his inability to testify about the threats during his direct examination undermined their importance to his defense. The State argues the District Court either justifiably excluded the statements as irrelevant or impermissible character evidence of the victim or nonetheless committed harmless error.

6

¶13 Evidence having "any tendency to make the existence of any fact that is of consequence . . . more probable or less probable," is relevant and generally admissible. M. R. Evid. 401, 402. Even if relevant, hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally not admissible. M. R. Evid. 801(c), 802. Also generally not admissible is character evidence, evidence admitted for the purpose of proving action in conformity with a characteristic or trait. M. R. Evid. 404(a). Character evidence is admissible, however, if the evidence is offered by an accused to prove a pertinent character trait of the victim. M. R. Evid. 404(a)(2).

¶14 Cunningham asserted the affirmative defense of justifiable use of force, commonly referred to as self-defense. "A person is justified in the use of force . . . against another when and to the extent that the person reasonably believes that the conduct is necessary for self-defense . . . ." Section 45-3-102, MCA. A "person is justified in the use of force likely to cause death or serious bodily harm only if the person reasonably believes that the force is necessary to prevent imminent death or serious bodily harm to the person . . . ." Section 45-3-102, MCA. "The primary issue in the affirmative defense of justifiable use of force is the reasonableness of the defendant's belief that the use of force is necessary. Therefore, only facts known to the defendant at the time of the incident are relevant." *State v. Branham*, 2012 MT 1, ¶ 10, 363 Mont. 281, 269 P.3d 891. "[T]he state of mind and intent of the defendant" is also relevant. *State v. Weinberger*, 204 Mont. 278, 292, 665 P.2d 202, 210 (1983). "A defendant who asserts a justifiable-use-of-force defense may offer the victim's character evidence only in limited circumstances." *State v. Hauer*, 2012 MT 120, ¶ 27, 365 Mont. 184, 279 P.3d 149.

7

¶15 In assessing Cunningham's defense of justifiable use of force, the jury was required to determine whether Cunningham's use of force and level of force was "necessary to prevent [his own] imminent death or serious bodily harm." Cunningham's knowledge that Horn was physically fit; a military-trained sniper, especially skilled in hand-to-hand combat; that he served time in a high security section of prison; and that he threatened to "kick [Cunningham's] ass and stomp [his] head into the ground" were all relevant to the jury's determination. The statements the District Court excluded were not hearsay because they were offered for the purpose of demonstrating Cunningham's state of mind—why Cunningham believed he needed to use his knife and protect himself against Horn, an unarmed, but younger and physically fit man. The statements were probative of Horn's conduct and behavior and helped to explain Cunningham's reactions which led to his use of force. If admitted, the District Court could have instructed the jury that use of the statements was limited to the jury's consideration of Cunningham's state of mind. The jury could have been cautioned not to consider the statements as evidence of Horn's bad character or for the truth of the statements themselves; that is, whether Horn was a trained sniper, was recently released from prison, or spent time in the high security section of prison. However, by excluding the statements, the jury did not hear all the facts and circumstances "tend[ing] to throw light upon the parties and their relations and feelings towards each other," which is critical to assess a claim of justifiable use of force. *Weinberger*, 204 Mont. at 292, 665 P.2d at 210.

¶16 Finally, the State suggested to the District Court that if Cunningham introduced Horn's statement that Horn was housed in Montana State Prison's "high side," the State

8

would then be able to cross-examine Cunningham on his history of incarceration and the basis for his knowledge of the "high side." While a valid concern for Cunningham to assess, balancing the risk of the jury hearing about Cunningham's potentially prejudicial criminal history against the value of the statement to Cunningham's defense of justifiable use of force was a matter of defense trial strategy and, thus, a decision for Cunningham to make.

¶17    We conclude that the District Court's ruling excluding Horn's statements as hearsay was erroneous; the statements were being offered, not for the truth of the matter asserted within them, but to establish Horn's and Cunningham's state of mind preceding their altercation. Cunningham's ability to present these statements to the jury was valuable to his affirmative defense of justifiable use of force. Accordingly, the District Court abused its discretion by excluding Horn's statements.

b. Evidence impeaching Dr. Bennett

¶18    Dr. Bennett was the forensic pathologist who conducted Horn's autopsy. Prior to trial, the State disclosed its intention to call Dr. Bennett as an expert witness. Also prior to trial, Cunningham's counsel received a letter, dated February 13, 2015, addressed to Dr. Bennett from the State Medical Examiner, Dr. Gary Dale. In the letter Dr. Dale asserted Dr. Bennett mishandled several child and infant autopsies, especially those related to Shaken Baby Syndrome, and that Dr. Bennett previously provided false testimony in criminal cases. The letter concluded by providing Dr. Bennett notice that his position as associate medical examiner would soon terminate.

¶19    Anticipating Cunningham's counsel would attempt to question Dr. Bennett at trial about the accusations contained in the letter, the State filed a motion in limine asking the District Court to preclude Cunningham from using the letter to impeach Dr. Bennett's credibility.  The State argued the letter was more prejudicial than probative and irrelevant to Dr. Bennett performing Horn's autopsy because Horn was an adult.  The State referred the District Court to a Connecticut case with similar facts where the court precluded the defendant from impeaching the medical examiner who conducted the victim's autopsy about an investigation into his misconduct.  The Connecticut Supreme Court held that the impeachment evidence "would inevitably have led to a 'mini-trial' of each of those cases" of alleged misconduct and confuse the jury. *Connecticut v. Paradise*, 567 A.2d 1221, 1230 (Conn. 1990).

¶20    Cunningham responded that he should be allowed to question Dr. Bennett about his termination, allegations of professional errors, and instances where Dr. Bennett was accused of providing false testimony in other cases.  These questions, Cunningham argued, would help the jury determine the credibility of Dr. Bennett's testimony.  At a pre-trial conference, Cunningham's counsel gave the District Court examples of the limited questions he intended to ask Dr. Bennett, such as:  "did you receive a letter terminating your employment as an associate medical examiner[,] . . . were there allegations of inappropriate professional efforts at autopsies, were there allegations of incomplete reporting, were there allegations or questions about testimony that was unsubstantiated in other trials[?]"  Defense counsel explained that he did not want to delve into the details of each autopsy identified in the letter or to confuse the jury with "irrelevant and immaterial

10

issues." However, the letter raised concerns of Dr. Bennett's competency as a medical examiner and truthfulness as a witness, which Cunningham maintained were very relevant given the disputed issue of the manner in which the fatal cut occurred.

¶21 The District Court granted the State's motion and precluded Cunningham from using the letter to impeach Dr. Bennett. The District Court concluded the letter was not relevant to Cunningham's case because the alleged mishandling of autopsies and false testimony related to child or infant autopsies and noted in contrast, "Cunningham is charged as an adult with causing the death of another adult." Further, the District Court stated it was "not willing to open up a trial of Dr. Bennett in this case."

¶22 The State presented evidence contradicting Cunningham's justifiable-use-of-force defense. Specifically, the State presented three witnesses—a police officer, an investigator, and Dr. Bennett—who relied on blood evidence to offer their opinion that Horn was likely already on his back, and not standing, when Cunningham cut him. The testimony supported the State's position that Horn was not an imminent threat to Cunningham when Cunningham used force. Notably, Dr. Bennett testified as the State's expert about the crime scene lacking evidence blood spurted or sprayed from Horn's neck when he was cut. This testimony controverted Cunningham's theory that the cut he inflicted was made deeper than he intended because the two men were falling together. Cunningham testified, "I don't think his throat would have been cut so deep if he hadn't pulled me down on top of him as I was cutting." Dr. Bennett gave his opinion that evidence of blood spurting out of Horn's neck would have been extensive if Horn had been standing or falling at the time Cunningham cut his left carotid artery and jugular vein because these vessels are highly

11

pressurized. Instead, there was relatively little blood evidence anywhere except from the large pool beneath where Horn's neck was resting prior to the ambulance staff removing him.

¶23 Dr. Bennett's testimony was comprehensive, covering many aspects of the incident. He first testified about his background and experience having performed "almost 12,000 forensic autopsies" over the course of his lengthy career and stated, "You can hear stories, but the body doesn't lie." He testified that Horn's body appeared "well-developed, well-nourished, [and] muscular." He testified that Horn was "severely intoxicated" when he died, with an alcohol concentration of 0.295 and a THC concentration, the active ingredient in marijuana, of 4.9. He testified that Horn had no defensive wounds and that Horn's face and neck had seven distinct knife wounds as a result of what he likened to "more of a sawing motion" than "a slash like Zor[r]o." In its closing argument, the State summarized, "The last witness you heard from the State was Dr. Bennett. He is a board certified forensic pathologist. There was no challenging his credentials, and none was offered by Defense, his testimony went uncontroverted."

¶24 On appeal, Cunningham argues the allegations of Dr. Bennett's professional incompetence and previous false testimony were relevant to his qualifications and credibility. Cunningham maintains the District Court erred when it completely foreclosed any inquiry into the subject of Dr. Bennett's alleged incompetence, thus preventing Cunningham from effectively impeaching a crucial witness in the State's case. Cunningham maintains that Dr. Bennett was an expert witness and that the jury would, therefore, attribute significant weight to his testimony. Further, during the State's closing

argument the State was able to "have its cake and eat it too" when it referred to Dr. Bennett being unimpeachable. In combination, Cunningham argues the jury was left completely uninformed of Dr. Bennett's professional and credibility issues and the State was allowed to unfairly underscore his trustworthiness. The State responds that the District Court did not abuse its discretion by precluding Dr. Bennett's impeachment based on the letter because the letter was hearsay and contained only allegations, not proven instances of misconduct. Alternatively, the State argues Dr. Bennett's testimony was largely cumulative because two other witnesses provided the same opinion that Horn was already on his back when Cunningham cut his throat. As the police officer testified, if Horn had been standing when Cunningham cut him, both Horn and Cunningham would have been "drenched in blood."

¶25 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." M. R. Evid. 702. If probative of truthfulness or untruthfulness, an inquiry of a witness may be made about "[s]pecific instances of the conduct of a witness." M. R. Evid. 608(b). However, extrinsic evidence proving that conduct is not admissible. M. R. Evid. 608(b). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. Evidence that a State's witness previously lied is favorable evidence that the defense may use for impeachment purposes

13

absent a determination of inadmissibility pursuant to Rule 403. *State v. Weisbarth*, 2016 MT 214, ¶ 21, 384 Mont. 424, 378 P.3d 1195.

¶26 We disagree with the District Court's conclusion that allegations of Dr. Bennett's mishandling of child and infant autopsies and prior false testimony were irrelevant. Although Cunningham did not dispute that he inflicted the fatal cut, he did dispute the timing and manner in which the injury was inflicted and the positioning of the men. Here, the parties presented differing descriptions of Horn's and Cunningham's position at the time Cunningham cut Horn. Cunningham stated they were falling. Although the State presented three witnesses who testified that Horn was already on his back when he was fatally wounded, Dr. Bennett was the only medical expert who testified for the State. Dr. Bennett's knowledge, skill, experience, training, and education in the field of forensic pathology qualified him as an expert. Dr. Bennett testified as a pathologist that "the body doesn't lie." The District Court instructed the jury that it could "determine what weight [to] be given to the testimony of each witness" and consider any evidence that indicates whether the witness is "worthy of belief." The contents of the letter raised numerous concerns that impacted Dr. Bennett's credibility, which was squarely at issue. The jury made its determination about what weight to give Dr. Bennett's testimony without knowing he allegedly provided false testimony in other cases and would soon be relieved from his appointed position—impeachment evidence that was unquestionably favorable to the defense. An accusation that Dr. Bennett testified falsely in the past was highly relevant to his trustworthiness as a witness in this case. While the letter itself is not admissible, we conclude the District Court erred by not permitting the inquiry Cunningham proposed. We

also conclude the risk the jury might confuse the issues did not outweigh the probative value of the evidence for Cunningham's defense. Cunningham's counsel acknowledged that a full examination of the issues raised in the letter was not warranted or appropriate. Therefore, the District Court's exclusion of this probative and relevant evidence without allowing Cunningham even a limited inquiry into Dr. Bennett's competency was an abuse of discretion.

*c. Media publicity*

¶27 The jurors notified the District Court that they were concerned about someone in the media who may have taken a photograph of them using a cellphone. Outside the presence of the jury and addressing the media, the District Court stated:

> Ladies and gentlemen of the media, the jury had a concern that their photographs were being taken, and I know that you all who are here know the rules on that, but I just wanted to make sure I addressed that. They are concerned that their photographs are going to be put places or in the paper, on the news or in social media, and they wanted me to address that with you.

> So I don't know if counsel has any comments on that.

> I'm going to let them know when they come back that you all understand the rules and no jurors are going to be identified.

¶28 Cunningham's counsel, Gregory Paskell, expressed concern about potential prejudice where "the jury is intimidated that their picture is going to possibly appear someplace." Paskell expressed concern that this would put pressure on the jury to hasten its verdict or be intimidated and asked the District Court to confirm with the members of the media "that they are not to publish [the juror's] pictures." Counsel then moved for a mistrial. The State responded, commenting that "[the jury] expressed concern that a cell

phone was pointed at them, that might very well be, however, there is no evidence that any prejudice has applied to that, there is zero information that any of them have been influenced in any way by that . . . ."

¶29 Next, Paskell asked the District Court to poll the jury as to whether any juror feels intimidated or prejudiced by his or her belief that a member of the media photographed them arguing it had an "affirmative duty" to do so. Paskell, Christopher Morris (the State's counsel), and the District Court discussed a potential jury inquiry:

> THE COURT: What specific act do you want me to inquire about?
>
> MR. PASKELL: Three questions: Do you believe your picture was taken; do you have a specific response to the taking of your picture in this setting, and has that affected your ability to continue to sit and hear the evidence, apply the law and return a verdict. I think those three questions go to the State's concern, I realize it takes additional time, but this gentleman's life is at stake here.
>
> MR. MORRIS: Judge, for a brief response, it's a public trial and a public forum, there is no right to the privacy for the jurors, all their listed names are public record at this point.
>
> THE COURT: Okay. I have never seen in this jurisdiction a picture of a jury posted anywhere or identified their names, their faces, anything like that. We have pretty seasoned media who I think understand the media rules . . . .

The District Court denied Cunningham's motion for a mistrial and stated it was "going to advise the jury that the media respects their privacy and that they have nothing to be concerned about as far as identifying them with photographs . . . ." Instead, the District Court addressed the jury stating, "Before we continue, I wanted to let the jury know that this is a public trial, and the media respects your privacy when it comes to reporting on these cases . . . ." On appeal, Cunningham argues the District Court erred by not polling

16

the jury to inquire about their concerns. Cunningham also argues the District Court erred by not "advis[ing] the jury that the media respects their privacy and that they have nothing to be concerned about as far as identifying them with photographs," as the District Court suggested it would.

¶30 Defendants are entitled to an impartial jury. Mont. Const. art. II, § 24; U.S. Const. amend. VI. In the case of proven jury misconduct, we have held that "prejudice to the defendant is presumed." *State v. Eagan*, 178 Mont. 67, 79, 582 P.2d 1195, 1202 (1978). However, the presumption of prejudice may be overcome by a court's interrogation of the jury "which prove[s] that prejudice or injury did not or could not occur." *Eagan*, 178 Mont. at 79, 582 P.2d at 1202. Where the jury is not interrogated, "the presumption of prejudice remains." *Eagan*, 178 Mont. at 79, 582 P.2d at 1202. Where jury media exposure is suspected, we have declined to mandate an affirmative duty to interrogate the jurors about whether they were prejudicially exposed, leaving the decision to interrogate within the trial court's discretion to be reviewed for an abuse of that discretion. *Kirkland*, 184 Mont. at 241, 602 P.2d at 593.

¶31 Here, neither jury misconduct nor media exposure was suspected. Instead, a juror raised a concern about the possibility of a media member taking a photograph of the jury, which might subsequently be published. The District Court had discretion to address this concern and chose not to question the jury. Normally, the more prudent path to take would be to allow the defendant the opportunity to prove actual bias. That decision, however, was well within the District Court's purview. Nonetheless, the District Court did not address the jury in the manner it suggested it would. After considering the issue, the

17

District Court notified the parties it would tell the jury that the media respects its privacy and that jurors need not be concerned about being identified in published photographs. Instead, the District Court addressed the jury stating, "this is a public trial, and the media respects your privacy when it comes to reporting." While we cannot conclude that the District Court abused its discretion in denying Cunningham the opportunity to question the jury about its concerns and to prove actual bias, the better course would have been to determine the effect on the jury of the potentially prejudicial occurrence. Under these circumstances it would have been advisable for the District Court to hold a hearing and allow an inquiry. Additionally, while we determine the court's communication to the jury was inconsistent with its advisement to counsel, we do not conclude that the District Court's handling of this matter amounted to an abuse of discretion.

*d. Cumulative error*

¶32    "[P]rejudice may result from the cumulative effect of errors, and . . . the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error . . . ." 5 Am. Jur. *Appellate Review* § 668 (2007) (footnotes omitted). Defendants are entitled to a fair trial, not to a trial free from errors. *See State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735 (providing a test to determine whether trial error is harmless). Where individual errors would be insufficient alone, the sum of these errors can serve as a basis for reversal under the cumulative error doctrine. *Kills on Top v. State*, 279 Mont. 384, 392, 928 P.2d 182, 187 (1996). This Court recognizes, "The cumulative error doctrine mandates reversal of a conviction where numerous errors, when taken together, have prejudiced the defendant's

18

right to a fair trial." *Hardman*, ¶ 35. The defendant must establish prejudice; a mere allegation of error without proof of prejudice is inadequate to satisfy the doctrine. *McGarvey v. State*, 2014 MT 189, ¶ 36, 375 Mont. 495, 329 P.3d 576. To date, we have held the cumulative error doctrine applicable only to criminal proceedings. *Baxter v. Archie Cochrane Motors, Inc.*, 271 Mont. 286, 289, 895 P.2d 631, 633 (1995).

¶33 While we acknowledge that the cumulative effect of errors will rarely merit reversal, *State v. Lawrence*, 2016 MT 346, ¶ 27, 386 Mont. 86, 385 P.3d 968 (Baker, J. concurring), the errors Cunningham asserts, primarily the exclusion of Horn's statements and the inability to impeach Dr. Bennett, establish he suffered prejudice. As a result of the District Court's ruling on Horn's statements, Cunningham was unable to present evidence tending to show his state of mind and that of his victim. The evidence was relevant to Cunningham's defense of justifiable use of force and, ultimately, to his claim that his actions were reasonable. As a result of the District Court's ruling on Dr. Bennett's impeachment, Cunningham was unable to challenge Dr. Bennett's credibility, competency, and trustworthiness on a matter that Cunningham disputed—the timing of the fatal injury, the positioning of the men, and the manner in which the fatal cut occurred. The State was additionally allowed to suggest that, because Cunningham did not attempt to impeach Dr. Bennett's credibility, the jury could rely on Dr. Bennett being unimpeachable. Although the errors might not individually warrant reversal, we conclude that their cumulative effect prejudiced Cunningham's ability to present his defense of justifiable use of force and, therefore, denied him his right to a fair trial.

19

**CONCLUSION**

¶34    In sum, we first conclude the District Court erred by excluding statements Horn made to Cunningham as hearsay because the statements provided evidence of Cunningham and Horn's state of mind immediately preceding their altercation and tended to show why Cunningham used force.   Second, we conclude the District Court erred by prohibiting even a limited inquiry into Dr. Bennett's credibility based on the letter that accused him of misconduct, providing false testimony, and terminated his employment.   Third, although we recognize questioning the jury is the more prudent response, we conclude the District Court acted within its discretion in resolving the jury's concern about media publicity. Finally, we conclude that the cumulative effect of the first two errors denied Cunningham of his right to a fair trial.

¶35    The judgment is reversed and these proceedings are remanded for a new trial.


                                                      /S/ LAURIE McKINNON


We Concur:

/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JIM RICE