Justice Beth Baker, dissenting.
¶125 I join the Court's Opinion on Issues 1 and 2. I dissent from its analysis of Issue 3 and would affirm Laird's conviction.
¶126 It doesn't matter whether Dr. Mueller's statement about the bruising on Kathryn's neck was offered for the truth of the matter asserted. The statement was excepted from the hearsay rule and not otherwise inadmissible.
¶127 At oral argument, the State repeated its trial position that Dr. Mueller's statement about the "troubling" bruises was admissible as a present-sense impression, excepted from the hearsay rule under M. R. Evid. 803(1) : "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." The guarantee of trustworthiness under Rule 803(1) "is provided by the spontaneity of the event and the reduced likelihood of deliberate misrepresentation; direct and cross-examination of either the declarant or the witness who heard the hearsay statement adds to accuracy and aids in evaluation." Commission Comments to M. R. Evid. 803 (citing Advisory Committee's Note to Fed. R. Evid. 803, 56 F.R.D. 183, 304 (1972) ).
¶128 "The timing element [of Rule 803(1) ] assures the trustworthiness of present sense impressions in two ways: it reduces the likelihood of faulty recollection and precludes time for reflection." State v. Hocevar , 2000 MT 157, ¶ 47, 300 Mont. 167, 7 P.3d 329 (citing Christopher B. Mueller & Laird C. Kirkpatrick, Evidence § 8.34 ***75 (1995)). Dr. Mueller's statement that the bruises were "troubling" was made contemporaneously with his examination of Kathryn's body; it was not "a description of events that were observed in the past." Hocevar , ¶ 47 ; see State v. Hope , 2001 MT 207, ¶ 14, 306 Mont. 334, 33 P.3d 629 (upholding as recorded present sense impression admission of victim's handwritten notes, "made immediately after she perceived the event or condition," that she feared "big trouble" after the defendant's outburst because he was so angry). Cf. Hocevar , ¶ 48 (rejecting application of present-sense impression *447 exception to statements made five and twelve days after event); State v. Sanchez , 2008 MT 27, ¶ 21, 341 Mont. 240, 177 P.3d 444 (rejecting application of present sense impression exception to an event the declarant perceived the evening prior to her statement).
¶129 The Court correctly recognizes that Dr. Mueller's comment about the bruises being "troubling" came "contemporaneously" with his observation of them. Opinion, ¶ 23. Agent Jackson heard the comment as Dr. Mueller made it and as the pathologist pointed out the areas of hemorrhaged blood in the neck muscles that concerned him. The statement, made while Dr. Mueller was perceiving the event, described the condition he perceived. It was admissible under Rule 803(1) and our case law applying that rule.
¶130 The Court concludes, however, that regardless whether Dr. Mueller's statement was admissible under the rules of evidence, the District Court violated Laird's Sixth Amendment confrontation right by admitting it. Recognizing that the issue turns on the distinction between testimonial and nontestimonial hearsay, the Court concludes that Dr. Mueller's statements constituted the former. "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." Crawford , 541 U.S. at 68, 124 S. Ct. at 1374. Nontestimonial hearsay statements that fall under an exception to the hearsay rule thus are admissible in criminal trials. In my view, the Court is mistaken in concluding that Dr. Mueller's statement is testimonial.
¶131 Initially, I would not decide the case on this basis, because Laird did not develop any Confrontation Clause argument on appeal. Although his opening brief asserts summarily that admitting the hearsay statement was a violation of his confrontation rights and cites Crawford v. Washington and Michigan v. Bryant , it contains no analysis to support this contention. The burden is on the appellant to establish error by the trial court-even a constitutional error. State v. Baker , 2008 MT 396, ¶ 18, 347 Mont. 159, 197 P.3d 1001.
***76 M. R. App. P. 12(1)(g) requires the argument section of appellant's opening brief to contain the contentions "with respect to the issues presented, and the reasons therefor, with citations to authorities, statutes, and pages of the record relied on." The Court commonly refuses to address arguments that the parties have not properly briefed. See Johnston v. Palmer , 2007 MT 99, ¶ 30, 337 Mont. 101, 158 P.3d 998 ("As we have stated on numerous occasions, ... it is not this Court's obligation to conduct legal research on behalf of a party, to guess at his or her precise position, or to develop legal analysis that may lend support to that position."). We should decline to address this issue here.
¶132 On the merits, the primary purpose of the autopsy was to determine the cause of Kathryn's death, not to gather evidence for a criminal prosecution. The vast majority of autopsies do not lead to criminal investigations. See United States v. James , 712 F.3d 79, 99 (2d Cir. 2013). The autopsy was conducted one day after Kathryn died. At that time, investigators did not know whether she died as the result of a tragic accident, suicide, or criminal activity. There was no criminal investigation open, because no one yet knew if a crime had been committed. Further, at the time of the autopsy, Laird was not a suspect.
¶133 Importantly, the United States Supreme Court has never addressed whether autopsy reports are testimonial. And "courts throughout the country have applied various approaches and reached differing conclusions when considering Confrontation Clause challenges to the introduction of autopsy reports." James , 712 F.3d at 97 n.7. Though it discusses developments in the United States Supreme Court, the Court does not address the disparity of treatment that such reports have received among federal and state courts. See, e.g. , United States v. Moya , 748 Fed. App'x 819, 829-31 (10th Cir. 2018) (holding that a toxicology report ordered by the medical examiner as part of an autopsy was not testimonial because medical examiners routinely conduct autopsies that do not lead to criminal investigations or prosecutions and the primary purpose of an autopsy is to determine the cause of death); James , 712 F.3d at 99 ("In short, the autopsy report was not testimonial because it was not prepared *448 primarily to create a record for use at a criminal trial."); United States v. Ignasiak , 667 F.3d 1217, 1233 (11th Cir. 2012) (holding that autopsy reports are testimonial based on Florida statutes regulating autopsies and because such reports are forensic reports "dependent upon the skill, methodology and judgment exercised by the actual medical examiner who performed the autopsy"); ***77 People v. Dungo , 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442, 450 (2012) ("In short, criminal investigation was not the primary purpose for the autopsy report's description of the condition of Pina's body; it was only one of several purposes. The presence of a detective at the autopsy and the statutory requirement that suspicious findings be reported to law enforcement do not change that conclusion. The autopsy continued to serve several purposes, only one of which was criminal investigation. The autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial."); see also Carolyn Zabrycki, Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement , 96 Calif. L. Rev. 1093, 1115, 1137 (2008) (suggesting that "excluding the autopsy report where a medical examiner dies effectively functions as a statute of limitations for murder" and that "autopsy reports do not pose the danger against which confrontation protects and are therefore not testimonial"). "Abstractly, an autopsy report can be distinguished from, or assimilated to, the sworn documents in Melendez-Diaz and Bullcoming , and it is uncertain how the [United States Supreme] Court would resolve the question" whether such documents are testimonial in nature. Nardi v. Pepe , 662 F.3d 107, 111 (1st Cir. 2011). Without reference to this authority, the Court concludes that the spontaneous statement made during an autopsy was like the certificates at issue in Melendez-Diaz , because it was "functionally identical to live, in-court testimony." Opinion, ¶ 106. Notably, the District Court carefully considered Confrontation Clause issues at trial. It did not admit Dr. Mueller's first autopsy report into evidence in this case. And it admitted the death certificate only after redacting the statement "unexplained bruises to neck and trunk" that the coroner attributed to Dr. Mueller's first autopsy report.
¶134 But the question before the Court today is easier to answer. The challenged statement is not from the official autopsy report. It was a spontaneous statement Dr. Mueller made during the autopsy. If there are questions whether the report itself is testimonial for Sixth Amendment purposes, it is even less likely that spontaneous statements made during the autopsy will be held testimonial. Dr. Mueller conducted the autopsy to determine the cause of death. During his examination, he spontaneously remarked that bruising around Kathryn's neck was "troubling." This statement was not made with the primary purpose of establishing or proving "past events potentially relevant to later criminal prosecution." Davis , 547 U.S. at 822, 126 S. Ct. at 2274. The comment was made while Dr. Mueller examined the body with the primary purpose to determine the cause of death. He ***78 could not reasonably believe such comments "would be available for use at a later trial." Crawford , 541 U.S. at 52, 124 S. Ct. at 1364. The vast majority of autopsies do not lead to criminal investigations or prosecutions, and the State did not charge Laird with a crime until fifteen years later.
¶135 That the statement was made in the presence of Agent Jackson and Coroner Bullis also is not determinative. The Court acknowledges that when Agent Jackson requested authorization for the autopsy he did not know whether "criminal activity was or was not the cause of the death." Opinion, ¶ 100. Agent Jackson ordered the autopsy to investigate the circumstances surrounding Kathryn's death. See Opinion, ¶ 105. And because Kathryn's death was unattended, Bullis had the responsibility as coroner to determine, if possible, how Kathryn died. Opinion, ¶ 105. As the Supreme Court of California explained, autopsies "serve several purposes, only one of which [is] criminal investigation." See Dungo , 147 Cal.Rptr.3d 527, 286 P.3d at 450. Despite the presence of Agent Jackson and Bullis at the autopsy, the primary purpose remained determining how Kathryn died. "In the end, the question is *449 whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " Clark , 576 U.S. at ----, 135 S. Ct. at 2180 (quoting Bryant , 562 U.S. at 358, 131 S. Ct. at 1155 ). "[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial." Clark , 576 U.S. at ----, 135 S. Ct. at 2180. Given the spontaneous nature of the comment and that, at the time it was uttered, no one present knew whether Kathryn's death was the result of criminal activity, the primary purpose of the statement was not to "creat[e] an out-of court substitute for trial testimony." Bryant , 562 U.S. at 358, 131 S. Ct. at 1155. I would hold that Dr. Mueller's spontaneous statement is not testimonial.
¶136 I disagree further with the Court's summary rejection of the State's harmless error argument. Of course, there is no need for harmless error analysis if, as discussed above, there was no error. The Court's added concerns flow largely from its mistaken conclusion about the Mueller statement. For example, the Court concludes that the State piled on when it continued to reference the "troubling" nature of the neck bruises. Opinion, ¶ 77. Because the District Court properly allowed the statement, the State's references also were permissible. The Court also notes the prosecutor's inadvertent improper reading of an excluded portion of Dr. Mueller's findings to the jury. Opinion, ¶ 77. But the record shows, as I discuss below, that Dr. Bennett confirmed each of those findings during his testimony-asphyxia by drowning, ***79 pre-mortem bruising to the left thumb, and multiple scattered bruises with "recent unusual bruises of muscle of neck"-and explained each one. He suggested no area of disagreement with Dr. Mueller's report. Finally, the Court relies on a statement the prosecutor made in closing argument that Dr. Bennett "was terminated as an assistant state medical examiner at the direction of ... the attorney general's office." Opinion, ¶ 110. Defense counsel made no objection to this comment at trial, and Laird does not seek reversal on appeal under the plain error doctrine for prosecutorial misconduct. Laird instead mentions the prosecutor's comment in the argument summary of his opening brief, suggesting that it led the jury to convict him in spite of the State's alleged failure to present sufficient proof of a homicide. The Court rightly rejects Laird's sufficiency of evidence claim. Opinion, ¶ 70. But it fails, in my view, to analyze the closing argument in the full context of the trial or to apply a proper standard of review in deciding to reverse the conviction on this basis.
¶137 Dr. Bennett gave lengthy, detailed, and scientific testimony, beginning with a recitation of his considerable qualifications and experience-forty years of forensic pathology, having performed over 12,000 autopsies, including four or five thousand during his seventeen years in the State of Montana. He was the only witness to present forensic evidence of the manner of Kathryn's death, and his testimony unmistakably assisted Laird's defense.
¶138 Dr. Bennett opened by describing his profession and practice, offering that he currently serves Wyoming coroners, "and then families [and] others across Montana, Wyoming and other states doing forensic autopsies and consultations." After discussing his extensive experience, Dr. Bennett described his work on this case. He and Dr. Mueller were business partners. Dr. Mueller and Agent Jackson asked Dr. Bennett to participate in the second post-mortem examination of Kathryn's body. All three were present when Dr. Bennett conducted the second autopsy, and he "was lucky Dr. Mueller was there ... so [he could] pick[ ] his brain." Dr. Mueller assisted in the second autopsy and ultimately included both his and Dr. Bennett's report in the final autopsy report. Both participated in the collection of the tissue samples that would be microscopically examined. Though the State argued that Dr. Bennett had changed his opinion about the manner of Kathryn's death, Dr. Bennett was able to explain-by acknowledging and concurring with the concern Dr. Mueller had over the bruising on Kathryn's neck-that the additional microscopic examination of the neck tissue convinced him that the bruising was not a result of strangulation. Without Dr. Mueller there, the State could not challenge *450 Dr. Bennett's ***80 explanation.[1] Throughout his testimony, Dr. Bennett used the term "we" when discussing the autopsy and its findings, suggesting that he and Dr. Mueller had no variance of opinion.
¶139 Dr. Bennett explained to the jury in fine scientific detail how the process of drowning occurs. Within this discussion, he explained how the comprehensive sample of tissues he collected from Kathryn's body showed the physiological effects of drowning. Once the person's head is submerged, she begins to pull water into the larynx area; for a brief time, the larynx will spasm and block that, but then it opens up and fresh water is pulled into the lungs. At that point, he explained, it starts to have some involuntary neural, or seizure-like, activity, involuntarily pulling the muscles. "[T]he violent muscle activity can actually tear the muscles. Tear them enough, so that when you embalm them, the damaged blood vessels in the muscle will then get these bruises like we saw here." Dr. Bennett concluded from this analysis, especially given the location of the hemorrhaging and the lack of any evidence of facial petechiae, that Kathryn suffered no "inflicted trauma to her neck" but that "[i]t is a process of drowning that caused these hemorrhages."
¶140 After the State began its cross-examination, the District Court entertained lengthy arguments from counsel outside the presence of the jury about the proper scope of the prosecution's inquiry and of permissible rebuttal evidence. The State wanted to probe two primary lines of inquiry, Dr. Bennett's change of opinion and his history with alleged autopsy errors and false testimony. The prosecutor had asked Dr. Bennett about statements he made to an FBI Agent and an Assistant Attorney General in 2012 about Kathryn's body showing signs of throttling and strangulation; Bennett replied that they may have discussed that, but he did not acknowledge such statements as reflecting his own opinion. When the prosecutor began to ask about Dr. Bennett's work in Iowa, Laird's counsel objected, and the Court excused the jury to consider the parties' positions. It refused to allow the State to pursue Dr. Bennett's past troubles and advised that it would not allow the State to call either the FBI agent or Assistant Attorney General in rebuttal. The court ruled:
[The State] can challenge credibility, that's allowed. But it goes to this, he gave an opinion, he was terminated, fired, let go, asked to ***81 leave. I don't know exactly how it happened. And - you know, I don't know the reasons are [sic] - I know enough to know that there was concern that - on autopsies of children. Not autopsies of adults, but autopsies of children. And clearly, that's not Kathryn Laird's category.... On the basis of autopsy error in the past, that's not a basis to challenge his - the credibility of the Kathryn Laird autopsy. But you can challenge the sequence of events. He gave an opinion in 1999. You purport he gave an opinion in 2012. He was fired in 2015. He's giving a different opinion today. Is he doing that in retaliation for his firing?
¶141 Cross-examination continued, and the prosecutor legitimately probed Dr. Bennett about the basis for his newly formed opinion that Kathryn sustained the bruises in the process of drowning and they were made to appear worse during embalming. Laird agreed that this line of questioning was "fair game." Laird does not dispute-nor could he-that Dr. Bennett's falling out with the State was a proper area of inquiry for cross-examination. As the District Court observed, a party must be able to challenge the credibility of another party's witness, and it properly allowed the State to make the point that Dr. Bennett "was asked to leave, let go, whatever it was," to probe whether it biased him against the State.
¶142 We have been insistent that a trial court abuses its discretion if it does not allow a party to impeach a witness for the purpose of challenging the witness's credibility. State v. Cunningham , 2018 MT 56, ¶ 26, 390 Mont. 408, 414 P.3d 289 ; State v. Flowers , 2018 MT 96, ¶ 21, 391 Mont. 237, 416 P.3d 180 ;
*451 State v. Zimmerman , 2018 MT 94, ¶ 28, 391 Mont. 210, 417 P.3d 289 ; Maier v. Wilson , 2017 MT 316, ¶ 43, 390 Mont. 43, 409 P.3d 878. We found reversible error in Cunningham because the trial court would not allow the defendant to impeach the same Dr. Bennett with evidence of his alleged mishandling of child and infant autopsies and prior false testimony. Cunningham , ¶ 26. The State's attempt to point out that the only thing that changed between the autopsy report and Dr. Bennett's trial testimony was the dissolution of the State's relationship with him was appropriate impeachment.
¶143 The remaining question is whether the State's reference to that falling out as a termination by the Attorney General, when it had not presented evidence that Dr. Bennett was "terminated," was plain error. It bears repeating that Laird has not made such an argument. In any event, our standards for plain error review are settled. Applied sparingly, the doctrine "may be used in situations that implicate a defendant's fundamental constitutional rights, and where failing to ***82 review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." State v. Lawrence , 2016 MT 346, ¶ 9, 386 Mont. 86, 385 P.3d 968 (internal quotations and citations omitted). Even when a prosecutor's remark admittedly is "not proper," we affirm a defendant's conviction when an "isolated incident" of misconduct, reviewed in the context of the entire argument and trial record, does not compromise the integrity of the trial. State v. Ritesman , 2018 MT 55, ¶¶ 27-28, 390 Mont. 399, 414 P.3d 261. We have declined on many occasions to reverse a conviction for prosecutorial misconduct in closing argument to which the defendant did not object, and I will not recount them here. "[W]e generally have refused to invoke plain error review of allegedly improper closing arguments regarding witness credibility." State v. Aker , 2013 MT 253, ¶ 30, 371 Mont. 491, 310 P.3d 506 ; see also State v. Awbery , 2016 MT 48, ¶¶ 29-30, 382 Mont. 334, 367 P.3d 346. Other cases involved error more troubling than a mischaracterization of the evidence. We upheld Ritesman's conviction, for example, despite the prosecutor's improper plea to the jury in concluding her rebuttal argument-when the defendant had no opportunity to respond-that it must do "your job as jurors" to "make sure that [the victim] is safe, to make sure that she is heard, and that we give the control back to her." Ritesman , ¶¶ 9, 28. And in State v. Lacey , 2012 MT 52, ¶¶ 19, 24, 364 Mont. 291, 272 P.3d 1288, we affirmed the conviction despite the prosecutor's argument that, "by God," the defendant was guilty. In a rare exception, we reversed Lawrence's conviction because the prosecutor incorrectly told the jury in argument that the presumption of innocence had been removed, violating the "bedrock, axiomatic, and elementary tenet of our criminal justice system" that the presumption is not overcome until the jury has determined, based on evidence "beyond a reasonable doubt, that the defendant is guilty of the crime charged." Lawrence , ¶¶ 10, 16.
¶144 Unlike in today's Opinion, we have been careful to examine the prosecutor's improper comment in light of the argument as a whole. Such an examination in this case reveals that the prosecutor's comment was an isolated one as he summarized the evidence to argue why the jury should not credit Dr. Bennett's opinion and why the evidence showed beyond a reasonable doubt that Laird was guilty. In the State's closing argument, the prosecutor meticulously tied together all of the circumstantial evidence to show the jury how it proved that Laird was responsible for Kathryn's death and why Laird's theory didn't add up. Turning to Dr. Bennett's testimony, the prosecutor ***83 pointed out areas of discrepancy with his original findings and with other evidence. He then reminded the jury that, "despite [Dr. Bennett's] claim that there was no forensic evidence that this was a homicide, he also admitted that he can't rule it out." The only thing that had changed after Dr. Bennett used the terms "strangulation" and "throttling," the prosecutor argued, was that he was terminated at the direction of the attorney general's office. He concluded:
You should totally disregard Dr. Bennett's new opinion. It is completely inconsistent with the facts. And if it's just a drowning, then why does Brian Laird lie to the Missouri *452 Bar and so many others? Because he knows that only he knows what actually happened that night. And if he misleads you enough, you'll think that's a reasonable doubt. That's why.
¶145 Laird's trial counsel had the opportunity to respond to the prosecutor's remark and did. Referring to the "civil dispute" between the State and Dr. Bennett, defense counsel said:
He's not going to come in here and jeopardize his otherwise very busy practice and reputation and somehow that he's going to misinform you folks of the jury under oath, because he's got some type of squabble going on with the State. And he denies what deny [sic] - they say happened, but he denies it. But you know, really, that's not part of this case. Let them handle it someplace like adults, but don't bring it in here and muddy up the waters. That's not fair to you.
He, too, then discussed the evidence in detail, concluding that "there is no evidence proof beyond a reasonable doubt that this was a homicide. None. And it's not backed up forensically. It is not backed up forensically."
¶146 In its rebuttal closing, the State asked the jury not only to find Dr. Bennett not credible, "but we'd ask that even if you find that pathologist credible, to look what he really says and realize that he doesn't have anything to say about the case." Of course, the prosecutor noted, Kathryn died of freshwater drowning. When asked his opinion whether the death was caused by human agency, the prosecutor quoted, Dr. Bennett said:
"I found no evidence." Then he corrects himself, "forensic evidence that indicated that Ms. Laird died at the hands of another." Really? Do you know why he corrected himself from evidence to forensic evidence, because the evidence, ladies and gentlemen, is overwhelming that someone put her in that water and that's why she drowned.
The prosecutor then returned to the other circumstantial evidence, ***84 responding to defense counsel's closing points, arguing to the jury that it left no reasonable doubt.
¶147 Reviewing the arguments as a whole, it is plain that they were properly focused on the evidence presented at trial. "The prosecutor buried [his improper] statement[ ] within an otherwise well supported, and permissible, commentary on the evidence and the credibility of witnesses." Lacey , ¶ 26. Recall that Dr. Bennett had told the jury as he began his testimony that he performed autopsies for "coroners across Wyoming" and for "families" and "others" in Montana and elsewhere. Though the State's explanation that the Attorney General's office "terminated" him lacked a record basis, there is no dispute that by the time of trial, Dr. Bennett no longer had a working relationship with the State of Montana. This lone misstep, placed in the context of a complicated case, well-tried by counsel for both sides and conscientiously overseen by the District Court, did not render Laird's trial unfair. The trial court's judgment should be affirmed.
Justices Jim Rice and James Jeremiah Shea join in the dissenting Opinion of Justice Baker.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.

When arguing this issue below, the State specifically related to the District Court, "they had their own client's words support the exact same story that Russell Renner would have provided."